**Martin HARRIS, Jesse Kithcart, Jonathan Lewis, Roy Cold, Carol Ransome, John Cummings, Raymond Whittington and Derrick Jones**

**v.**

**Joan REEVES, in her official capacity as Commissioner of the Department of Human Services of the City of Philadelphia, Rev. Albert F. Campbell, Labora M. Bennett, James D. Barber, Allen M. Hornblum, Mark Mendel, Donald J. Pa-**

---

dova, each in his or her official capacity as a member of the Board of Trustees of the Philadelphia Prison System, J. Patrick Gallagher, in his official capacity as Superintendent of the Philadelphia Prison System, Willie Gray, in his official capacity as Warden for Holmesburg Prison, Press Grooms, in his official capacity as Warden of the Detention Center, Harry Moore, in his official capacity as Warden of the House of Corrections, James S. White, in his official capacity as Managing Director in the City of Philadelphia, Hon. Wilson Goode, in his official capacity as Mayor of the City of Philadelphia, and the City of Philadelphia.

Civ. A. No. 82–1847.

United States District Court,
E.D. Pennsylvania.

March 26, 1991.

David Richman, Philip Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiffs.

Charisse Lillie, City Sol., Barbara Potts, Philadelphia, Pa., for City of Philadelphia.

Ron Castille, Sarah B. Vandenbraak, Gaele Barthold, Office of Dist. Atty., Philadelphia, Pa., for Dist. Atty.

## MEMORANDUM OPINION

SHAPIRO, District Judge.

In this civil rights action complaining of overcrowding in the Philadelphia County prisons, the court approved a Stipulation and Agreement of the parties and entered it as an order of the court. That Order of March 11, 1991, revises and replaces in part a Consent Decree in effect since December 30, 1986. The court now states its reasons for approval.

The Philadelphia prison system is one of many prison systems burdened with old and inadequate facilities and a rising rate of incarceration. The parties agree that the Philadelphia prisons should house no more than 3,750 inmates, yet the population has fluctuated between 4,500–5,000 for some years. More prison beds are needed, and the Stipulation and Agreement provides for them, but better prison planning and greater efficiency in the administration of justice also are needed. The Stipulation and Agreement addresses these concerns.

Dealing with prison overcrowding takes time and coordinated effort. This action was filed in 1982. The parties reached a Settlement Agreement which this court approved and entered as a Consent Decree on December 30, 1986. The City agreed to implement procedures and policies to reduce the prison population and maintain it at a reduced level. *See Harris v. Pernsley,* 654 F.Supp. 1042 (E.D.Pa.1987). Since then, the court has enforced the Consent Decree with certain modifications. Not all the requirements of the Consent Decree, such as building a new prison, were met. Nor has the prison population been reduced.

On December 20, 1990, the parties submitted for court approval a Stipulation and Agreement, designed to revise and replace parts of the former Consent Decree. The court preliminarily approved it and notified class members that a hearing would be held on final approval and written objections to the agreement could be submitted to the Special Master. After hearings on January 14, 1991 and February 26, 1991 the court approved the Stipulation and Agreement and entered it as an order of the court on March 11, 1991. To understand the Stipulation and Agreement and the reasons for its approval, it is necessary to review the history of this action.

## I. FACTS

### A. History of the Case

In entering the Consent Decree on December 30, 1986, the court certified a class consisting of "all persons who are, or who have been inmates of the Philadelphia Prison System since April 30, 1980, and all persons who shall be inmates of the Philadelphia Prison System in the future during such time as this Court retains jurisdiction of this matter." The Consent Decree provided that the court would retain jurisdiction for five years, with the possibility of extension on certain conditions.

The City was required to:

(1) hold all arrested persons at least four hours at the Police Administration Building to enable them to post bail;

(2) house no more than two inmates per cell;

(3) assign each inmate to long-term housing within 72 hours of arrival in the prison system and provide each inmate with a mattress by the first night after arrival and a bed and mattress within 24 hours of arrival;

(4) complete construction of the Philadelphia Industrial Correction Center with at least 650 cells by December 15, 1986;

(5) construct a downtown detention facility, with at least 440 beds, to be occupied by December 31, 1990.

The Consent Decree set a maximum allowable population ("MAP") for the Philadelphia Prison System of 3,750 inmates and MAPs for each individual facility. If the population of the system or any facility exceeded its MAP on July 13, 1987, the City was to seek from state court the release "of persons held either on the lowest bail or persons sentenced to the Philadelphia prisons with less than sixty (60) days remaining to serve on their sentences." If the MAP were still exceeded over a certain period of time, the Consent Decree provid-

ed for a qualified admissions moratorium that prohibited the City from admitting to its prisons any additional inmates, except for persons charged with, or convicted of, murder, forcible rape, or a crime involving the use of a gun or knife in the commission of an aggravated assault or robbery (the "excepted crimes"), until the population of the facility was within the MAP.

Prior to the court's approval of the Consent Decree, Ronald D. Castille, the District Attorney of Philadelphia County, moved to intervene in the proceedings as of right, under Fed.R.Civ.P. 24(a) or, in the alternative, for permission to intervene under Fed.R.Civ.P. 24(b). On December 31, 1986, the court denied the District Attorney's motion to intervene. *Harris v. Pernsley*, 113 F.R.D. 615 (E.D.Pa.1987). The District Attorney then moved to stay implementation of the ·Consent Decree, pending appeal of his motion to intervene; this court denied the motion to stay. 654 F.Supp. 1057 (E.D.Pa.1987). However, the Court of Appeals stayed implementation of the Consent Decree from March 6, 1987 to May 15, 1987 and from June 9 to June 15, 1987. On May 15, 1987, the Court of Appeals affirmed the denial of the motion to intervene and dismissed the District Attorney's appeal of this court's order approving the Consent Decree. Rehearing and *en banc* consideration were denied on June 15, 1987. *Harris v. Pernsley*, 820 F.2d 592 (3d Cir.1987).

The District Attorney petitioned the Supreme Court for a writ of *certiorari*. The Supreme Court stayed the application of this court's order from July 23, 1987 to August 13, 1987. The Supreme Court denied *certiorari* on November 9, 1987. *Castille v. Harris*, 484 U.S. 947, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987). Though denied the right to intervene, the District Attorney has been accorded status to be heard and object throughout this litigation; he has had the opportunity to provide the court with information he deems relevant to the court's remedial efforts and participate in all court proceedings. *See Harris v. Pernsley*, 820 F.2d at 603.

On November 13, 1987, on unopposed motion of the plaintiff class, the court appointed a Special Master, William Babcock, Esq., to assist this court in monitoring compliance with the Consent Decree.

On November 20, 1987, the court, finding the City in violation of the population limits of the Consent Decree,[1] agreed to a new bail program (Community Action to Release Effectively, or BailCARE). The City was authorized to post bail for certain pretrial detainees held for failure to raise bail of $5,000 or less. This court also extended the date for compliance with the population limit of 3,750 until December 31, 1987, and, if the population limits were not met, ordered the admissions moratorium in effect on January 4, 1988.

However, on December 31, 1987, the Pennsylvania Supreme Court announced a Philadelphia rule that from that date forward, defendants in custody would, with few exceptions, be tried within 180 days or have the right to petition for immediate release on nominal bail pending trial. (Crim.Pro.Rule 1100). Priority was to be given to the trial of persons held in custody rather than those released on bail. Because the plaintiff class and the City agreed with the Chief Justice of Pennsylvania that the population of the Philadelphia prisons would soon be reduced, the parties

---

**1.** After August 13, 1987, with few exceptions, the daily population exceeded 3,950 inmates. Because the stay orders made compliance difficult, the plaintiff class and the City jointly requested an extension of the deadlines, which the court granted on July 14, 1987. The new schedule and limits were:

| | | |
|---|---|---|
| July 20, 1987 | – | 3,950 inmates |
| September 14, 1987 | – | 3,850 inmates |
| October 19, 1987 | – | 3,750 inmates |

The qualified admissions moratorium was to take effect on September 25, 1987, but the par-

ties stipulated to establish November 23, 1987 as the deadline for reducing the prison population to 3,750 inmates and set certain intermediate limits.

On October 5, 1987, in accordance with a stipulation of the plaintiff class and the City, the court ordered intermediate limits as follows:

| | | |
|---|---|---|
| October 15, 1987 | – | 3,950 inmates |
| November 9, 1987 | – | 3,850 inmates |

None of these limits were timely met.

stipulated to another extension of deadlines by the court.[2] The court then ordered the City to implement a qualified admissions moratorium on June 3, 1988, if the limit of 3,750 were not met.

Before the Pennsylvania Supreme Court's 180–day rule would have had any demonstrable effect, Philadelphia trial judges were directed "to hold all rulings and dispositions on petitions filed pursuant to Criminal Procedure Rule 1100 until further order of the Supreme Court," and to "immediately implement the listing of serious bail cases." Memorandum of Administrative Judge Edward J. Blake to Judges of the Trial Division, dated May 27, 1988.

As of June 3, 1988, it was reported to this court that 3,981 persons were in the Philadelphia prisons, 3,035 of whom were pretrial detainees awaiting trial,[3] and a qualified admissions moratorium went into effect. But the qualified admissions moratorium differed from the terms of the Consent Decree by excepting from the moratorium persons charged with felonies involving enumerated amounts of narcotics as well as the excepted offenses listed in the Consent Decree. It also departed from the Consent Decree in applying only to pretrial detainees (then approximately 75 percent of the prison population) and not to sentenced prisoners.[4]

To reduce the prison population to the MAP, the court ordered the City to post bail for 278 inmates held in default of bail in amounts of $2,500 or less (beginning with misdemeanor cases and with those inmates held longer than 180 days) until the MAP was met. Inmates against whom there were outstanding detainers or those charged with the crimes excepted by the Consent Decree were automatically excluded from this bail release program. An inmate released under this provision received written notice of the restrictions and obligations of release on bail including the date, time and place of his next scheduled court appearance. The court also entertained petitions from persons on state-ordered work release programs (in custody on evenings and weekends only) for placement on house arrest by electronic or other approved monitoring program.

Before the court's implementation of the qualified admissions moratorium, the Pennsylvania Legislature had enacted the following statute:

The district attorney shall receive written notice of, and shall have automatic standing and a legal interest in, any proceeding which may involve the release or non-admission of county prisoners, delinquents or detainees due to the fact, duration or other conditions of custody. In addition to the district attorney's rights in such a proceeding, the district attorney may seek any equitable relief necessary to protect the district attorney's interest in the continued institutional custody and admission of county prisoners, delinquents or detainees.

18 Pa.Cons.Stat. § 1108.

This provision became effective on May 24, 1988 and on May 27, 1988, the District Attorney filed a second motion to intervene in these proceedings and attached a "Memorandum of Law in Support of Objections to Release and Non–Admission of County Prisoners and Motion to Modify the December 30, 1986 Consent Decree." On June 3, 1988, the District Attorney filed a motion to stay implementation of the admissions moratorium pending decision on his motion to intervene and motion to modify the Consent Decree. This court denied the motion to stay implementation of the qualified ad-

---

**2.**

| | | |
|---|---|---|
| April 29, 1988 | – | 3,850 inmates |
| May 31, 1988 | – | 3,750 inmates |

**3.** Of those persons in pretrial status, 278 were held without detainers and had bail set in the following amounts:

| Bail Amount | | | Number of Inmates |
|---|---|---|---|
| $0 | – | 500 | 37 |
| $501 | – | 1,000 | 79 |
| $1,001 | – | 1,500 | 55 |
| $1,501 | – | 2,000 | 51 |
| $2,001 | – | 2,500 | 56 |
| | TOTAL | | 278 |

**4.** The court did not reduce the prison population by releasing on parole various categories of sentenced inmates without disciplinary infraction either 30, 60 or 90 days prior to their parole eligibility dates, as the Consent Decree permitted.

missions moratorium, as did the Court of Appeals.[5]

The District Attorney's second motion to intervene was not ripe for decision while the constitutionality of 18 Pa.Cons.Stat. § 1108 was challenged in state court. After the Pennsylvania Supreme Court affirmed the Commonwealth Court's determination that Section 1108 was constitutional, this court once again denied the District Attorney's motion to intervene. An appeal of the denial is pending.

Following implementation of the qualified admissions moratorium, it was hoped that a combination of restricted admissions, qualified release for persons awaiting trial under supervision (BailCARE), and electronic monitoring would achieve compliance with the Consent Decree. However, in response to the District Attorney's assertions about difficulties in prosecuting certain charges, the court allowed further exceptions to the qualified admissions moratorium: persons accused of domestic violence and abuse [6] or intimidation of witnesses or victims [7].

The District Attorney next contended defendants who did not qualify for admission to prison under this court's orders were repeatedly failing to appear for hearings because the defendants knew they would not be held for failure to appear. In response, the court ordered what came to be known as the two bench-warrant exception so that any defendant with two or more open bench warrants would be admissible to prison despite the admissions moratorium.[8]

The District Attorney also contended that drug traffickers were coming to Philadelphia because of the admissions moratorium and turning Philadelphia into a "drug capital." In response, on September 9, 1988, the court ordered decreases in the charged quantities of drugs necessary to allow admission to prison.

These modifications of the moratorium increased the prison population. To compensate, the court instituted a release program. The court authorized the City's Prison Management Unit to release certain pretrial detainees for persons admitted into the prison under the bench warrant and drug exceptions. These compensatory measures failed. The number of detainees admitted pretrial under the new exceptions far outnumbered those detainees eligible for compensatory release. Consequently, the population increased from 3,829 before the bench warrant and drug exceptions began, to 4,482 on February 1, 1989.

To meet crisis conditions in the prison, the court, after hearing, again modified the Consent Decree. The court authorized the People's Bail Fund to post bail in greater amounts than before, if a pretrial detainee otherwise met BailCARE requirements.

The court also modified the exception that permitted admission and pretrial release of persons with two outstanding bench warrants. The court ordered that a pretrial detainee admitted on a bench warrant be given a hearing within 48 hours of incarceration. If such hearing was not held within 48 hours, the detainee was to be released.

These measures failed to reduce the population sufficiently. Consequently, on April 17, 1989, the court replaced the compensatory release mechanism and augmented BailCARE by amending the admissions moratorium, with the agreement of both parties, to allow the release of pretrial detainees in various categories, including those who had been admitted under earlier court orders who would no longer qualify under the revised criteria.

The court required the PMU to submit proposed release orders to the District Attorney's Office for review. The proposed release orders, and the District Attorney's comments, have been forwarded within 72 hours to the Special Master, for recommendations to the court. Several release options have been available: sign-own-bail,

---

**5.** On June 6, 1988, the Court of Appeals granted a stay that was vacated that day.

**6.** Order of July 13, 1988.

**7.** Order of July 29, 1988.

**8.** Order of September 2, 1988.

house arrest on electronic monitoring, release to a residential treatment facility, or transfer to another county or state facility for later return.

The changes ordered in April, 1989, stabilized the population between 4,600 and 4,700 for a few months. But the population increased significantly through the summer and reached 4,881 by August 27, 1989. Prior to Labor Day weekend, the Commissioner of Prisons informed the court that overcrowding at the Philadelphia Detention Center had reached an emergency level. He requested authority to discharge on Friday any inmate whose release date fell on that holiday weekend. The court authorized such releases and extended authorization for Friday weekend releases for the remaining weeks of the year, after consulting with the state court administration.

The court continued to implement the admissions moratorium and release mechanisms throughout 1990 but the prison population never fell below 4,800. The population surged again in late summer, and peaked at a record 5,150 on September 11, 1990.

Following a hearing on September 4, 1990, the court ordered the City to complete construction of 40 beds at the House of Corrections and obtain 250 community based residential facility beds. The court also barred the admission to the prisons of certified youth offenders from the Youth Study Center and ordered the City to petition state court for early release of any sentenced inmate who was within 60 days of his or her minimum release date. In late September, 1990, the court raised the amount of drugs a defendant must be charged with possessing to qualify for admission under the moratorium.

When the court approved the Stipulation and Agreement, and entered it as an order of the court on March 11, 1991, the prison population was 4,697. This was 947 inmates over the MAP, and overcrowded by any standard.

### B. Court's Efforts to Provide Interim Relief

Throughout this litigation, the court has closely monitored the City's compliance with the Consent Decree and all subsequent orders of the court. Twenty-nine status conferences have been held since the entry of the Consent Decree, and the Special Master has submitted a compliance report at each conference. The Special Master and assistants appointed by the court, have obtained information through regular visits to the prisons, interviews with prisons' staff and inmates, and review of prison records. The court, with and without the Special Master, also has periodically visited the prisons to observe compliance with the court's orders.

The court's orders have covered more than refusal to admit persons accused of crime or their release. The parties have suggested other measures to reduce the prison population. To expand capacity, the City renovated Laurel Hall and converted it from a work-release facility to a minimum-medium security prison with a capacity for 175 inmates. To replace the lost work-release beds, the City contracted for 100 male work-release inmates at Francis House. The City obtained funding from the Pennsylvania Commission on Crime and Delinquency to contract with the Program for Female Offenders for the operation of a 25-bed women's work release center.

At the direction of the court, the City also contracted with the Greater Philadelphia Center for Community Corrections for the use of 25 minimum security treatment beds for pretrial detainees. Funding was provided by the fines imposed by the court for the City's failure timely to complete the renovation of Laurel Hall and installation of an improved fire alarm system at the House of Corrections.

By Order of July 29, 1988, the City was directed to implement a house arrest/electronic monitoring program for sentenced inmates. The program was designed to require the approval of individual sentencing judges; the District Attorney opposed this until he was allowed prior

review of each petition.[9] With the implementation of the early release mechanism in April, 1989, the court expanded the house arrest program to include pretrial detainees not considered good risks for release on their own recognizance.[10]

The court also directed the Special Master to meet with the parties and the District Attorney to develop an earned time/good time early parole program for sentenced inmates. In response to the efforts of the parties, the District Attorney and the state court administration, the state court implemented such a program itself.

The court also considered arguments by the City, based on experience in other jurisdictions, that a primary cause of prison overcrowding was the length of time from arrest to disposition; pretrial detainees originally made up approximately 75% of the inmate population. At the recommendation of the Special Master, the court directed the City to seek federal funds for an evaluation of the Philadelphia Criminal Justice system.

Through a grant from the Bureau of Justice Assistance, the City contracted with the Evaluation, Management and Training Group, Inc. (EMT Group), whose four-person team issued a report on March 27, 1989. The report supported the City's position. While the study noted the lack of reliable data, it concluded that the median time from arrest to trial in Philadelphia was approximately 270 days. This compared unfavorably with a study of 18 urban trial courts by the National Center for State Courts in which it was reported that 10 of the courts had median disposition times of 90 days or less. *See* the EMT

Group, Inc. Technical Assistance Report, at 11–12.

Subsequently, the Pennsylvania Supreme Court appointed two separate commissions, the Levin Commission and the Sheppard Commission, to evaluate the administration of the Philadelphia criminal justice system. The reports of each Commission corroborated the findings of the EMT Group and made a series of recommendations to improve the administration of justice in the state courts. The state courts are considering these recommendations and have implemented some of them.[11]

The prisons remain overcrowded, but the percentage of inmates convicted and sentenced to county prison[12] has increased, and the percentage of pretrial detainees has decreased to approximately one-half the total City prison population.

### C. Construction of New Prison Facility

The Consent Decree of December 30, 1986 required the City to build a 440–bed downtown detention facility by December 31, 1990. The City initially planned to build a detention facility and courthouse for the criminal division of the state courts, called the Criminal Justice Center, at 13th and Filbert Streets. By June, 1988, the City estimated that the facility would not be completed until late Spring, 1991. By January, 1989, the court was informed that the project would not be finished until September, 1991. In February, 1989, the City halted construction of the Justice Center and claimed escalating costs exceeded the amount of bond money available for the project.

---

9. The City agreed to provide the District Attorney the opportunity for prior review of all such petitions in an attempt to increase the number of individuals released to the program.

10. The court directs the release of pretrial detainees whom the City represents as needing drug or alcohol treatment, to inpatient treatment facilities where available and appropriate.

11. Also under serious consideration are the Conclusions and Recommendations of a report prepared for the City of Philadelphia, Court of Common Pleas and Municipal Court, in *Bradley,*

*et al. v. Goode, et al.,* (Ct.C.P.Civ. No. 2595), prepared by Deloitte & Touche and the American University Adjudication Technical Assistance Project, filed June 14, 1990. The Final Report discusses *Case Management in Philadelphia,* in Vol. I, Sec. V—35–38, and corroborates the long median time to criminal case disposition; see Sec. V—36.

12. A sentence of 11½ to 23 months has to be served in a county facility; a sentence of 29½ to 59 months may be served in a county facility at the discretion of the sentencing judge.

On May 8, 1989, the court held a hearing on a Rule to Show Cause why the City should not be held in contempt for abandoning the downtown detention facility that they were ordered to construct. At the hearing, the City submitted a plan for a new prison, not downtown, but in Northeast Philadelphia, adjacent to three existing facilities. On May 31, 1989, the court ordered the City to provide financial, architectural and programmatic information to the Special Master and a court-appointed consultant, Donald Stoughton. The court required the information to determine whether the downtown facility should be constructed as ordered, or whether the City's alternative plan, alone or modified, would be acceptable. To preserve the funding for prison construction, the court ordered that no bond or capital funds unencumbered as of May 31, 1989, should be spent or committed without 10 days' advance notice to the court.

Consultant Stoughton reported that he could not recommend building a prison in the Northeast because the City's plan lacked a preliminary site analysis and a detailed functional and architectural program. Without adequate space for health care and food services in the new facility, the plan failed to consider whether existing facilities could provide these services. The City withdrew its proposal and the parties, aided by the court's Special Master and consultant, began negotiating in late Spring, 1989, to develop a comprehensive long-range plan to alleviate crowding and build a new prison.

### D. Review of Stipulation and Agreement

In the Stipulation and Agreement submitted to the court, the parties acknowledge that: since the Consent Decree, all of the MAPs have been exceeded so that a moratorium has been in effect continuously from September, 1988; for the past several months the population has exceeded the MAP by more than 30 percent; a downtown detention facility could not be completed by December 31, 1990; and new prison construction is inadvisable until the needs of the prison system are determined and addressed.

The parties, making no admissions respecting the merits of the case, sought the court's approval of the Stipulation and Agreement. Its terms fall into five categories: 1) long-term relief of overcrowding, 2) short-term relief of overcrowding, 3) monitoring and implementation, 4) sanctions to prevent non-compliance, 5) other provisions.

### 1) *Long-term Relief*

Those provisions dealing with long-term relief are found in paragraphs 11 through 15 of the Stipulation and Agreement. Paragraph 11 obliges the City to implement a Prison Planning Process, attached as an Appendix to the Agreement, and provides that opening a new facility, or closing or renovating an existing facility must be in accordance with the planning process and approved by the court.

The Prison Planning Process calls for the City to do much more than simply plan for new or renovated facilities. The process comprises six parts: A) Population Projections; B) Prison Population management Plan; C) Physical and Operational Standards; D) Capital Projects Management Plan; E) Operational Management Plan; and F) Management Information Services Plan.

### A) Population Projections

The City will develop a 10–year projection of the inmate population in Philadelphia that will include: the number of inmates to be received and processed at intake each year for 10 years; the average daily population each year for 10 years, (first, assuming no changes in operation of the criminal justice system and second, assuming the system is changed as suggested in recent court studies). Assumptions relating to demographics, criminal justice policy and resources used in making projections must be stated. There will be a method and schedule for revising the model.

### B) Population Management Plan

The City will develop a Population Management Plan consistent with the population projections. The Population Management Plan will include: a projected

average daily population classified by legal status, sex, adult or juvenile status, special program or service requirements, and need for proximity to judicial facilities; an inmate classification plan; a housing unit assignment plan; a comprehensive plan of alternatives to incarceration; and a plan for expediting the disposition of criminal cases through sentencing and an evaluation of the need for additional courthouse facilities.

C) Physical and Operational Standards

The City must promulgate Physical and Operational Standards for existing and any new prison facility that comply with constitutional and correctional industry standards. Once the physical standards are developed, the City will compare the existing facilities against those standards, and bring any facilities found deficient into compliance. Based on the population projections, Population Management Plan, and analysis of facilities, the City must plan to build necessary new space.

D) Capital Projects Management Plan

The Capital Projects Management Plan will provide for funding renovation and construction. The plan also will provide for management systems and structures needed to "program, site, design, bid, construct and open the facilities in a fiscally prudent and timely manner."

E) Operational Management Plan

The Operational Management Plan provides for an operational budget for the prison system based on the population projections and construction and renovation plans, staff training and roster management programs for all facilities, manuals of policy and operating procedures for all facilities, and the opening of new or substantially renovated facilities.

F) Management Information Service Plan

The Management Information Service Plan provides for identification of information and methods needed to perform all requirements. Finally, there is a schedule for implementation of all the provisions in the planning process.

The remaining paragraphs, relating to long-term remedies provide that: the terms of this Agreement supersede paragraph 2.e of the Consent Decree calling for the completion of a downtown detention facility by December 31, 1990 (¶ 12); the Mayor must appoint a Criminal Justice Project Coordinator for carrying out the Prison Planning Process (¶ 13); and the bond funds originally allocated for the downtown detention facility shall be designated for use only in accordance with a previous order of this court (¶ 15).

2) *Short-term Relief*

The Agreement contains two forms of short-term relief: expanded capacity, and early release of eligible pretrial detainees. Paragraph 16 requires the City to provide a minimum of 250 beds in a facility that provides "alcohol and substance abuse rehabilitation, training and other support services," by April 3, 1991.

The early release mechanism for pretrial detainees, originally established by Order of April 19, 1989, is revised. The City must now submit to the Special Master names of 35 pretrial detainees per day, five days per week, whenever the overall MAP is exceeded. (¶ 17(b)). The criteria cover those in custody who no longer would be admissible and those in custody on the lowest amount of bail for the longest of time *not* charged with murder, attempted murder, forcible rape, attempted rape, involuntary deviate sexual intercourse, corrupting the morals of a minor, arson, kidnapping, aggravated assault, a crime of violence committed or attempted with a firearm, knife or explosive, escape or domestic violence and abuse. (¶ 17(a))

Names will be provided concurrently to the District Attorney who will have 72 hours to object in writing (¶ 17(d). The District Attorney may object if there have been errors in the application of the release criteria or for considerations of public safety. The Special Master will direct the release of pretrial detainees meeting the court's formulated criteria (¶ 17(e). If the District Attorney objects to a particular release for public safety considerations, that inmate will not be released if the District Attorney designates the name of another eligible pretrial detainee, not already

submitted. The Special Master's findings of fact will be final. If an inmate's next court date is within two weeks of the date listed for review by the Special Master, he may postdate the release directive for a date following the next court date. Defendants must comply with a release order within 24 hours of receiving it, (¶ 17(f)). Finally, if the court or the Special Master is unavailable, the court will designate a judicial officer to review the names submitted by the PMU, (¶ 17(g)).

The City may formulate and submit to the court other criteria and procedures for release of inmates as a possible alternative or concurrent mechanism with that provided in Paragraph 17 (¶ 30).[13]

### 3) Monitoring and Implementation

Paragraphs 19(e), 20, 21 and 23–26 deal with monitoring and implementation of the substantive provisions of the Stipulation and Agreement. Paragraph 19(e) requires the Special Master to monitor compliance with the qualified admissions moratorium and amended release mechanism (¶ 17).

Plaintiffs and the involved agencies have 10 days in which to comment on each plan submitted by the City according to the Prison Planning Process. After 10 days, the plan will be forwarded to the court with the Special Master's recommendation (¶ 20).

If there are any objections to a plan, the parties and the involved agencies, with the assistance of the Special Master, will have 30 days to attempt to resolve their differences (¶ 21). If no resolution is reached in 30 days, the Special Master will submit the plan, the objections and the Special Master's recommendations to the court. If the parties (or an involved agency for good cause shown) do not request a hearing within 10 days of the Special Master's submission to the court, the Special Master's findings shall be accepted as uncontested.

Once the Court approves a plan, the City must implement it (¶ 23). If practical, parts of a plan will be presumed separable

so that objection to one part will not delay other parts.

The Special Master will provide the court with quarterly plan compliance reports; the first such report is due three months after approval of the initial plan (¶ 24). The parties have ten days from the submission of a compliance report to request a hearing (¶ 25). If a hearing is not requested, the Special Master's findings will be accepted as uncontested.

There are more detailed procedures for the submission of compliance reports and subsequent hearings (¶ 26). The Special Master first will submit a preliminary report to the parties who will have fifteen days to comment. The Special Master will submit a final report to the court and the parties within two weeks of receipt of the parties' comments. The parties will have ten days to submit written objections to the final report to the court, and, pursuant to ¶ 25, may request a hearing. If a hearing is requested, the Special Master will hold a prehearing conference with the parties at least one day prior to the status conference, and report to the court on those issues remaining in dispute.

### 4) Sanctions

The Stipulation and Agreement also provides sanctions for noncompliance. A fine of $100.00 per day will be imposed for each inmate admitted to the prisons in violation of the qualified admissions moratorium (¶ 19(b)(1)), and for each inmate eligible for release pursuant to Paragraph 17 who is not submitted for review (¶ 19(b)(2)),[14] or is not released after receipt of a release order (¶ 19(b)(3)). These provisions are effective only when the MAP is exceeded (¶ 19(d)).

If a plan required to be submitted pursuant to ¶ 11 and the Prison Planning Process is not timely submitted (¶ 31) or is not in substantial compliance with the requirements for such plan, or submitted in bad faith, the City will be fined $500.00 per day for the first 30 days and $1,000.00 per day

---

13. The remaining provisions relating to the early release mechanism provide that Paragraph 17 supersedes the procedures in Paragraphs 4A–C of the Order of September 21, 1990 (¶ 18), and is not severable (¶ 32).

14. This provision applies only if defendants do not list 35 names per day, (¶ 19(c)).

thereafter until an acceptable plan is submitted (¶ 22). The City will also be fined $500.00 per day for the first 30 days and $1,000.00 per day thereafter for each day of delay in complying with a plan requirement (¶ 27). The City will be allowed a reasonable extension of time for avoidable delays due to causes not reasonably foreseeable and entirely beyond the control and without the fault or negligence of the defendants.

All fines collected pursuant to ¶¶ 19, 22, and 27 "shall be used or distributed by the court on the advice of the parties and the Special Master" (¶ 28).

### 5) *Other provisions*

There are four other provisions of the Agreement. Plaintiffs' counsel is entitled to fees and costs incurred in the negotiation and implementation of the Stipulation and Agreement (¶ 29). Because a separate Stipulation and Agreement is being negotiated in a related state action, *Jackson v. Hendrick*,[15] the Stipulation and Agreement will be contingent for 30 days on an order by the *Jackson v. Hendrick* court "removing any conflicts between orders of that court and the Stipulation and Agreement" (¶ 31). This Stipulation and Agreement becomes effective thirty days from this court's order of March 11, 1991, irrespective of any action or inaction by the *Jackson v. Hendrick* court, unless the City makes a timely application to the contrary to this court.

This court will retain jurisdiction to enforce the provisions of the Stipulation and Agreement, notwithstanding Paragraph 6 of the Consent Decree (¶ 35). Finally, plaintiffs withdraw their motion to vacate the Consent Decree without prejudice to the right to reinstate the motion at any time (¶ 34).

---

**15.** In February, 1971, five inmates of the Philadelphia prison system instituted *Jackson v. Hendrick*, a class action in equity in the Court of Common Pleas of Philadelphia County, Pennsylvania; the action attacked the constitutionality of their conditions of confinement and requested injunctive relief against prison and city officials and the City of Philadelphia. On April 7, 1972, a three-judge court held that conditions in

## II. DISCUSSION

### A. Notice to the Class

Some form of notice of settlement to class members is mandatory under Fed. R.Civ.P. 23(e), but the trial court has broad discretion in determining the timing and manner of notice. *See Harris v. Pernsley*, 654 F.Supp. at 1047 (citations omitted). In determining what manner of notice to provide, a district court generally considers the cost of giving notice, the difficulty of identifying class members, the timing of the notice and the likelihood of notice reaching potential class members. *Id.*, at 1048 (citations omitted).

Before approving the earlier settlement, the court determined that it was impractical to provide individual notice because the class was very large, not all its members could be identified (i.e. future prisoners), and many other members could be identified only after great time and expense. Because of the problems of providing individual notice to class members, the court determined that individual notice to the class representatives, and to the remaining members through publicity in the media and through posting notice in the prisons satisfied Rule 23(e).

The difficulties of providing individual notice remain. Individual notice to the class representatives and to other class members through the media and through posting in the prisons remain the best way to provide whatever notice is required. The Stipulation and Agreement was submitted to the court on December 21, 1990. By order of December 28, 1990, the court preliminarily approved the Stipulation and Agreement, directed counsel for plaintiffs to send notice to all named plaintiffs, directed the City defendants to publish notice to the class as a whole, and ordered that proof of publication be submitted to the

the Philadelphia County prisons violated the rights of inmates under, *inter alia*, the United States and Pennsylvania Constitutions. The *decree nisi* appointed a Prison Master to administer the court's corrective decree. On June 7, 1972, the decree became final; it was later affirmed by the Pennsylvania Supreme Court. *Jackson v. Hendrick*, 457 Pa. 405, 321 A.2d 603 (1974).

court at a hearing on January 14, 1991. *See Harris v. Reeves*, Order, December 28, 1990, ¶¶ 1, 4, 1990 WL 238417. The notice was a three-page summary of the key provisions of the Stipulation and Agreement. *See* Notice to the Plaintiff Class: All Inmates in the Philadelphia Prison System (attached as Exhibit 2 to the Order of December 28, 1990) ("Notice").

Counsel for plaintiff notified the class representatives. The City submitted affidavits that copies of the Notice had been posted in the inmate housing areas on January 7, 1991. *See* Letter to court from Charisse R. Lillie, City Solicitor, of January 9, 1991, and affidavits attached thereto. The Stipulation and Agreement also received extensive coverage in the news media, both print and electronic. The notice to the class of the revised Stipulation and Agreement was adequate.

**B. Approval of Stipulation and Agreement**

Federal Rule of Civil Procedure 23(e) requires court approval of a class action settlement.[16] The Stipulation and Agreement revises and supersedes the earlier Settlement Agreement entered as a Consent Order on December 30, 1986. Because the Stipulation and Agreement affects the interests and rights of the plaintiff class, the court decided to apply the same criteria for approval as it applied to the prior settlement.

A court has discretion to approve a proposed class action settlement, *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir.1975), if it is "fair, adequate, and reasonable" to class members. *Walsh v. Great Atlantic & Pacific Tea Company, Inc.*, 726 F.2d 956, 965 (3d Cir.1983). The Third Circuit Court of Appeals in *Girsh* set forth a nine-factor analysis to be used in determining the fairness of a settlement. Those factors are: ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh*, 521 F.2d at 157, quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974). While *Girsh* does not require it, the objections of the District Attorney, who has been allowed to appear and object, have also been considered.

**1) *The Complexity, Expense and Likely Duration of the Litigation***

Before approving the settlement in 1986, the court found that a trial of this action "would be very complex for all parties, extremely expensive, and not in the interest of the administration of justice." *Harris*, 654 F.Supp. at 1049. All this remains true.

The case has grown even more complex. If the Stipulation and Agreement were not approved, the court would be required to rule on plaintiff's motion to vacate the Consent Decree, filed by the class during the extended consideration of this Stipulation and Agreement. The motion to vacate presents difficult and serious questions of the court's jurisdiction under a Consent Decree. It is not clear whether a federal court retains jurisdiction to enforce a Consent Decree when one of the parties no longer consents because the court, acting in accordance with its concept of the public interest, has not compelled full compliance with the Consent Decree.

The court might deny the motion to vacate, in which case continued enforcement of the Consent Decree and other interim relief pending construction of new prison beds would continue. The court might

---

**16.** Rule 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class....

grant the motion to vacate, in which case litigation would resume at the stage it was before the settlement agreement of November 14, 1986. The risk and uncertainty of litigation described in the court's opinion in support of the Consent Decree would remain.

### 2) Reaction of the Class

Many members of the class initially reacted negatively to the proposed Stipulation and Agreement. The court's Order of December 28, 1990, directed class members to send their comments to the Special Master, counsel or class representatives for presentation to the court at a hearing on January 14, 1991.

In response to the Notice, petitions bearing a total of 2,566 inmate signatures were submitted and presented to the court. The petitions varied somewhat in exact language, but all opposed the Stipulation and Agreement. These petitions did not articulate reasons for opposition, but generally alleged the bad faith of the City and expressed skepticism that the terms of the Stipulation and Agreement would be met.

At the hearing on January 14, 1991, two class representatives, Jesse Kithcart and Jonathan Lewis, testified against the Stipulation and Agreement; former class representative Valerie Drakeford testified in support. See Notes of Testimony ("N.T.") 1/14/91, at 72–78 (Jesse Kithcart); 78–79 (Valerie Drakeford); and 80–85 (Jonathan Lewis). Lewis and Kithcart urged the court to grant the motion to vacate the Consent Decree and allow the case to be tried. Counsel for plaintiffs argued that the Stipulation and Agreement was in the interest of the class and offered the best hope that the goals of the class could be realized. See N.T. 1/14/91, at 45–65. See also Memorandum of Law in Support of Approval of the Stipulation and Settlement of February 4, 1991, at 12 ("the reality is that the class is unlikely to obtain a more favorable remedial decree even if the motion to vacate is granted and this case is ultimately tried to a favorable result").

Following the hearing, class representatives consulted further with their counsel to become better informed about the Stipulation and Agreement. At the next hearing on February 26, 1991, three class representatives, including Kithcart, spoke in support of the Stipulation and Agreement. See N.T. 2/26/91, at 61–65 (Jesse Kithcart); 65–66 (Carol Ransome); and 67–68 (Roy Cold). Counsel for plaintiffs represented that two other class representatives, Derrick Jones and Raymond Whittington, would have testified in support had they attended the hearing. See N.T. 2/26/91, at 68. The court nevertheless expressed concern about approving the Stipulation and Agreement in view of petitions in opposition filed by so many identifiable members of the class.

Counsel for plaintiffs stated that many class members supported approval of the Stipulation and Agreement, and many of those who had signed petitions in opposition had changed their views after further consideration. The court gave the plaintiffs 10 days to submit additional evidence of support. See N.T. 2/26/91 at 71.

New petitions in support of the Stipulation and Agreement were submitted on March 7, 1991: These petitions contained signatures of 1,296 inmates from Holmesburg, the House of Corrections, and the Philadelphia Industrial Correction Center (P.I.C.C.). Additional petitions containing signatures of 339 inmates from P.I.C.C. also were submitted. The cover page preceding the signatures stated that the inmates, upon further consultation with counsel, the Special Master and representatives of the Pennsylvania Prison Society, "now support the Stipulation and Agreement and its entry as an order of the Court." This total of 1,635 signatures is significant because no petitions were circulated at the Detention Center (the class representative there had been released). All the named class representatives have now expressed their support (except for the Detention Center representative). See Letter To the Court from Plaintiffs' Counsel (March 7, 1991).

The conflicting and shifting reaction of the class to the Stipulation and Agreement, evidenced by the petitions pro and con, is not surprising. Inmates living under condi-

tions of severe overcrowding are understandably frustrated. The initial petitions in opposition reflected this frustration; one urged inmates to "(fight, rumble, take it to the citys ASS!)". *See* Memorandum of Law in Support of Approval of the Stipulation and Agreement at Ex. A. In the absence of stated reasons for opposition to the Stipulation and Agreement, this frustration does not require disapproval of a settlement the Court finds in the best interest of the class. To the contrary, the present reaction of the class, manifested by the informed support of the named class representative and class counsel, together with the most recent petitions received by the Court, is a factor supporting the Court's approval of the Stipulation and Agreement.

### 3) *Reaction of the District Attorney*

The District Attorney's primary objections to the Stipulation and Agreement are that it fails to provide for sufficient increased prison capacity and that it continues to provide for early release of certain pretrial detainees, a policy the District Attorney believes is inimical to public safety and to the efficient administration of the criminal justice system.

The District Attorney argues that a requirement that the City expand the prison system's capacity by only 1,250 beds is inadequate. This slights the City's efforts to increase capacity. The City has opened P.I.C.C. with a maximum allowable population of 850 inmates. The City has renovated and expanded Laurel Hall to its current capacity of 175 inmates, contracted for the use of Francis House as a 100–bed men's work release center and contracted with the Program for Female Offenders to operate a 25 bed work-release center (with additional capacity under consideration). Through its contract with the Greater Philadelphia Center for Community Corrections, the City will have a 250–bed treatment facility fully operational by April 3, 1991, and is committed to building *at least* another 1,000 beds by May, 1994. The District Attorney argues that the 1,000–bed facility is merely a replacement for Holmesburg, but the decision about the

future of Holmesburg, as that of the other facilities, must await the planning process provided for by the Stipulation and Agreement.

The City is not required to commit itself to more than 1,250 beds at this time because the Stipulation and Agreement requires the City to enter into a long-range planning process. The City is required to prepare population projections as to the number of inmates to expect and the level of security needed to house them, produce physical and operational standards by which to measure existing facilities, and demonstrate what is usable and what needs to be renovated or replaced. The City must also plan to expedite the disposition of criminal cases and provide alternatives to incarceration that will impact on the number of individuals to be incarcerated. To require the City to provide more than 1,250 beds before this planning process is completed is unreasonable. The District Attorney may participate in this planning process if he or she chooses to do so. Any recommendations for reducing the present prison population will be given serious consideration.

The release mechanism to which the District Attorney has expressed such vehement opposition has been made necessary by the City's inability to reduce the prison population below the MAP. The City has not complied with the MAP since September 9, 1988, the date the court expanded the exceptions to the qualified admissions moratorium at the request of the District Attorney. A substantial increase in the prison population from September, 1988 to April, 1989, made necessary the implementation of an early release mechanism for eligible pretrial detainees. Since this mechanism became effective, the District Attorney has been given the opportunity to review all names submitted for release and object to the release of persons he believed were ineligible for release. *See* Order of April 17, 1989, ¶ 4(a). The District Attorney has participated fully in this release mechanism.

The release mechanism in the Stipulation and Agreement, rather than being totally

new, is the release mechanism adopted in April, 1989 with three changes: the City must submit 35 qualified applicants per day for review, as long as the applicant pool allows; the Special Master, rather than the court, will decide whether a proposed release meets the criteria set by the court; and the District Attorney can prevent a release by submitting the name of an eligible candidate for release not already listed for review, as long as the pool allows.

The District Attorney objects to the amended release mechanism as "an improper delegation of a judicial function," to both the City and the Special Master. District Attorney's Brief at 16–17. He argues that the City should not be permitted to choose the defendants listed for review. But the Stipulation and Agreement does not grant the City any discretion to choose candidates for release. Assuming that the City has more than 175 candidates from which to select candidates for release each week, the Stipulation and Agreement establishes the priorities by which pretrial detainees are listed: those with the lowest bail held the longest time. *See* Stipulation and Agreement at ¶ 17(a)(2). If there are fewer than 175 eligible inmates, there is no choice at all.

The District Attorney maintains that permitting the Special Master to review the names of inmates submitted for release by the City and direct releases that meet court criteria is an improper delegation of judicial function. The District Attorney's argument is based on a misunderstanding of the role the Special Master will play under the Stipulation and Agreement. On each day that the admissions moratorium is in effect, the Special Master and the District Attorney will receive a list of pretrial detainees eligible for release. After considering objections of the District Attorney, the Special Master will review the information submitted by the City (such as the holding charges, amount of bail, next court date) and determine if the inmate is eligible for release under the criteria established by the court. The release criteria are so specific that determining if a detainee is eligible for release is a ministerial task not involving exercise of discretion. If an extraordinary case arises where application of the release criteria is unclear, nothing in the Stipulation and Agreement prohibits the Special Master from referring that release order to the court for instruction. A change in the release criteria can be made only after notice, hearing, and order of the court.

The court is aware of the District Attorney's concerns about release of pretrial detainees and certainly considers the impact of its orders on public safety and welfare. In enforcing the Consent Decree, the court has undertaken to release those who present the least risk to public safety. Only pretrial detainees, presumptively innocent under the Constitution, are presently eligible for release. The court has not ordered release of sentenced prisoners but instead has encouraged the implementation and expanded use for sentenced prisoners of state court early parole programs, such as earned time/good time credits for accelerated release, intensive supervision, house arrest and release with community service obligations. The court has also given the District Attorney a voice in determining the criteria for admission and release, and the opportunity to review and object to each release proposed, even though he is not a party to the litigation. On occasion, exceptions to the admissions criteria for certain individuals have been made by the Master or the court at the request of the District Attorney for cause shown.

The District Attorney argues that the release mechanism "will require the release of every defendant admitted to prison for drug offenses or pursuant to the bench warrant exception." *See* District Attorney's Brief at 3. His argument relies on the assumption that the pool of inmates eligible for release will be comprised of only these two categories of pretrial detainees, and that the number of people in these categories is not an adequate pool to insure that 175 petitions are submitted each week.[17]

---

**17.** The District Attorney also points to the fact that the City will be fined if it fails to submit

There will be other categories of inmates eligible for release. For example, the City will be able to submit the names of those inmates who were admitted to the prisons because they were charged with excepted offenses, are now eligible for release because the excepted charges have been dismissed but are still held on other non-excepted charges. Also, if the District Attorney believes that particular inmates should not be released for public safety reasons, even though the inmates meet the release criteria, the District Attorney can prevent their release if he designates for release an equivalent number of eligible inmates. The District Attorney may use this process to prevent the release of inmates charged with non-excepted drug offenses if he believes they present a particular threat to public safety.

The District Attorney also contends that the Prison Population Management Unit (PMU) has inadequately supervised defendants released under this court's orders, District Attorney's Brief at 9. To support this argument, the District Attorney compares the rearrest rate and failure to appear rate for those released under current federal release mechanisms with the rates for those released to programs administered by the Pretrial Services Division of the Court of Common Pleas.

The comparison between the *Harris v. Reeves* and Pretrial Services programs, in particular the Special Release Monitoring Program (SRMP) and Conditional Release (CR), are difficult to make because the program criteria and monitoring are very different. This Court's release mechanism applies to inmates who have been charged with non-violent offenses and who would not be incarcerated pending trial if they were able to post bail. The majority of the releases are Sign Own Bail (SOB), a category comparable to Pretrial Services' Release on own Recognizance (ROR) program.

The SRMP and CR programs are aimed at pretrial detainees who would not be eligible for an ROR program because of the nature of their charges or criminal history.

Pretrial Services has characterized the SRMP program as a CR program primarily for inmates with serious drug charges. The court has agreed informally to an exception to the qualified admissions moratorium for SRMP program violators not otherwise admissible, and agreed that these violators would not be listed for possible *Harris v. Reeves* release for at least 90 days; the parties in this case and the Special Master have acknowledged the value of the state SRMP program in conditionally releasing inmates not otherwise eligible for release. Since the state proposes release of higher risk inmates, the SRMP and CR programs provide more intensive supervision for those individuals on release; their intensive supervisors have small case loads to ensure contact between staff and clients. The SRMP program had only 64 clients under supervision as of January 31, 1991. While such a limited program is very worthwhile and its expansion should be encouraged, at present it cannot reduce the prison population to acceptable levels.

The District Attorney, criticizing PMU rearrest rates, refers to 962 *Harris v. Reeves* releases in 1990, but the PMU states there were 1,404 releases in 1990. *Compare* District Attorney's Offer of Proof, Joseph D. DiGuglielmo, *with* Memorandum of Law in Support of Approval at Ex. B, ¶ 12d (Affidavit of Jeanne Bonney). The PMU also points out that the District Attorney's argument is weakened by his failure to consider whether the 356 rearrests of those allegedly released by orders of this court, include individuals whose open charge or charges at the time of release had been disposed of at the time of rearrest. (Affidavit of Jeanne Bonney.) Such individuals should no longer be considered *Harris v. Reeves* releases.

Assuming that 356 is an accurate number of rearrests, the rate for the *Harris v. Reeves* release mechanism is 25%, close to the 21% rate for the *Jackson v. Hendrick* program. *See* District Attorney's Offer of Proof, Joseph D. DiGuglielmo. The state SRMP and CR programs involve more in-

---

175 petitions per week, but the Stipulation and Agreement requires the imposition of fines if

the City fails to submit 175 petitions only if there are 175 eligible inmates.

tensive supervision following release. While their rearrest rates are 18% and 15%, respectively, those programs do not provide a valid comparison. A more apt comparison would be the Pretrial Services Release on own Recognizance Program, but its rearrest rate has not been provided.

The same difficulty arises when comparing failure to appear rates. Failure to appear rates for the state Pretrial Services programs are somewhat lower than for *Harris v. Reeves* releases. But when the failure to appear rates of the state Pretrial Services programs are compared with the BailCARE Program, implemented by order of this court in November, 1987, the BailCARE failure to appear rate of only 4% compares favorably with the Pretrial Services programs failure to appear rates, ranging from 12% to 24%.[18] *Compare Twenty–Ninth Report of the Special Master* at 20–21 and Appendix T, with Offer of Proof, Joseph D. DiGuglielmo. This court has been satisfied with the efforts of the PMU to administer the court's orders.

The District Attorney argues that continued implementation of the amended release moratorium is against the public interest because of the increase in the number of bench warrants issued for defendants who fail to appear in state court. The District Attorney's assertion in his Offer of Proof that this court's orders have increased crime in Philadelphia is not supported by the evidence. The District Attorney's Offer of Proof includes a newspaper article stating that the number of reported crimes in Philadelphia increased in 1989 (Offer of Proof, Charles Gallagher at Ex. D), but the causes of crime are many and complex; it is simplistic to state that an increase in crime has been created by orders of the court. The same newspaper article states that "Philadelphia's experience was a national trend." The article also states that, despite the increase, "Philadelphia remains the safest of the nation's largest cities," as it has been "for more than 20 years." Also, in another newspaper article, it was reported that what the Federal Bureau of

Investigation terms major crime actually decreased in Philadelphia by approximately 8% in the past year. Affidavit of Jeanne Bonney at ¶ 12c.

Furthermore, the District Attorney has not proved that this court's orders have increased the failure to appear rate. There is no evidence comparing the number of bench warrants issued for persons who forfeited posted bail to persons who were released on a *Harris* order. Moreover, the number of bench warrants issued is not a valid criterion without comparison of the number of cases called for trial. Assuming the accuracy of information provided in the District Attorney's Offer of Proof, the number of bench warrants issued in the first six months of 1990 was substantially *fewer* than those issued in the comparable period of 1989. District Attorney's Brief, Ex. 2, at 3–4. While the number of bench warrants has increased since the issuance of the Consent Decree, the number of bench warrants disposed by the state court also has increased. The state court's Pretrial Services Division reports that the net number of outstanding bench warrants actually decreased from January 1987 to December, 1989 *See* Affidavit of Jeanne Bonney at ¶ 12(b) and Ex. 7. Far from being paralyzed by the orders of this court, the Court of Common Pleas reduced its backlog in 1990 from 12,199 to 8,659 cases (an impressive 29% decrease). *See* Memoranda in Support of Approval at Ex. C.)

The District Attorney's contention that the Stipulation and Agreement is against the public interest is based on the false premise that the District Attorney is the governmental official responsible for making that determination. The person who is charged with defining and protecting the "public interest" on the whole is the City's Chief Executive who has determined that the revised Stipulation and Agreement is in the public interest. The Mayor has concluded that the City cannot afford the moral, social or economic cost of holding too many inmates in jails designed to accommodate many fewer. Under the Philadelphia

---

**18.** Of the BailCARE cases which have been disposed, 54% have resulted in no conviction. By

any measure, the administration of this program has been most effective.

Home Rule Charter, the Mayor is responsible for fixing the capacity of the City's jails and has done so in this case. By accepting the provisions of the Stipulation and Agreement, the City, through its Mayor, has weighed competing concerns and has chosen to strike a balance where the "public interest" is deemed best served.

Finally, the District Attorney argues that approval of the Stipulation and Agreement makes permanent the "release and non-admissions provisions." District Attorney's Brief at 12. These provisions are in place only so long as the prison population exceeds the MAP. The entire purpose of the Stipulation and Agreement is finally to address prison overcrowding in Philadelphia so that short-term measures, such as the amended release mechanism and the qualified admissions moratorium, do *not* become permanent institutions.

### 4) *Stage of the Proceedings and Amount of Discovery Necessary*

The Settlement Agreement was reached before any significant discovery had taken place. There had been massive discovery in the related *Jackson v. Hendrick* state action. The court required the parties to produce additional information before approving the Settlement Agreement, so that the court could assess the fairness, reasonableness and adequacy of the settlement. The court toured the prisons before approving the Consent Decree, and has continued to visit them periodically. The Reports of the Special Master, containing much information and statistical data, have been made available to the parties and the public but there has been no formal discovery since the court has entered the Consent Decree. Notwithstanding the information available concerning the prison system, a great deal of supervised discovery would be required before trial because the conditions in the prisons have changed since the discovery completed in the *Jackson* action.

### 5) *Risk of Establishing Liability and Risk of Maintaining the Class Through the Trial*

The plaintiff class includes both sentenced prisoners and pretrial detainees. The constitutional standard to be applied to the two groups is different. For pretrial detainees, the test is whether the conditions amount to "punishment" without due process of law in violation of the Fourteenth Amendment. *See Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346 n. 31 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988), (citing *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). For sentenced inmates, the Eighth Amendment prohibits only "cruel and unusual" punishment. What constitutes "cruel and unusual" is determined by "the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (holding that double-celling is not *per se* unconstitutional).

Because pretrial detainees and sentenced inmates are housed together in the Philadelphia system, it is not clear the lower constitutional threshold for pretrial detainees would apply. *See Reece v. Gragg,* 650 F.Supp. 1297, 1300 (D.Kan.1986); *Fischer v. Winter,* 564 F.Supp. 281, 298 (N.D.Cal. 1983). Overcrowding amounts to punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981).

Development in the law since approval of the Consent Decree does not especially favor the plaintiff class. Recent Supreme Court decisions have made it more difficult for prisoners to challenge successfully the decisions and policies of prison officials. *See, e.g., O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (prison policy preventing inmates' attendance at religious service upheld as reasonably related to legitimate penological interests); *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (judicial hearing not required before the state may forcibly treat a mentally ill prisoner with antipsychotic drugs). In *Harper,* the Supreme Court made clear that the standard of review announced in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct.

2254, 96 L.Ed.2d 64 (1987)—that a prison policy is constitutional if reasonably related to a legitimate penological interest—applies "even when the constitutional right claimed to have ·been infringed is fundamental." *Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d at 199. Although *Turner* and the later cases did not involve allegations of unconstitutional overcrowding, the decisions are deferential to prison administrators.

There is an additional risk that a finding of unconstitutionality would apply only to certain units within the Philadelphia prison system. The present class consists of past, present and future prisoners in the entire Philadelphia prison system. Claims asserting unconstitutional conditions in the entire system were asserted in the second amended Complaint. This expanded class was certified for settlement purposes only and might not remain certified if the action were litigated. But even if this action went to trial on behalf of inmates at all units of the Philadelphia prison system, conditions of the units vary greatly. It may be that only conditions at Holmesburg, the oldest unit, are sufficiently severe to be unconstitutional. If that were the case, class members not now at Holmesburg or subject to transfer there would not share in whatever damages or injunctive relief might result.

### 6) *Risk of Establishing Damages*

In approving the original Settlement Agreement, the court acknowledged that if the plaintiff class established that conditions of confinement were unconstitutional, the court would be required to order some form of relief. However, there is no assurance that the relief would be greater or different than the relief provided by the Stipulation and Agreement. Upon a finding at trial that the overcrowding at the prisons is unconstitutional, the City might be liable to some members of the class in damages (presumably past and present but not future prisoners). In requesting approval of the original Settlement Agreement and with regard to this Stipulation and Agreement, the class as a whole has preferred equitable relief to relieve overcrowding: a long-term plan for rehabilitation, renovation and construction to meet correctional standards (as well as alternatives to incarceration) and interim relief. Considerations relating to money damages are not presently relevant.

### 7) *Ability of Defendant to Withstand a Greater Judgment*

When the Court approved the original Settlement Agreement, it stated that financial factors were not relevant because the City would have "to comply with whatever equitable relief the court ordered and pay whatever damages the court awarded." *Harris v. Pernsley*, 654 F.Supp. 1042, 1052 (E.D.Pa.1987). The same reasoning applies to the Stipulation and Agreement. Notwithstanding the City's current financial difficulties, it has agreed to substantial long-term financial obligations under the Stipulation and Agreement. For example, the City will build a 1000–bed prison and a criminal courthouse. Agreeing to such obligations shows the City's good faith.

### 8) *Reasonableness of Settlement*

In evaluating the Stipulation and Agreement, the court has considered, as it must, that it was negotiated by experienced counsel, representing the class vigorously and efficiently throughout this litigation. The City also supports the Stipulation and Agreement as the best way to solve the prison system's chronic overcrowding. The court has been advised that David Rudovsky, Esq., class counsel in the related *Jackson v. Hendrick* action, endorses the Stipulation and Agreement. Finally, the court is convinced that, despite their initial opposition, all the class representatives support the Stipulation and Agreement.

By approving the Stipulation and Agreement, the court does not condone the City's unilateral decision to halt construction of a 440–bed detention facility. But even if those beds had been made available on December 31, 1990 (as required by the Consent Decree), the prison population still would have exceeded the MAP, and nothing in the Consent Decree would have required the City to build additional facilities. Under the Stipulation and Agreement, the City not only has agreed to provide at least

1,250 new beds, but it has agreed to (and indeed has already begun) a comprehensive planning process. Instead of attacking the problems of the criminal justice system piecemeal, the City will evaluate current policies, practices and facilities within the entire criminal justice system and will do what is necessary to eliminate prison overcrowding in Philadelphia. Temporary measures such as the amended release mechanism and the qualified admissions moratorium will then become unnecessary. These provisions are not permanent and with the cooperation of the City, District Attorney, and state court system, they will become unnecessary sooner rather than later.

Under the Stipulation and Agreement, the plaintiff class gives up the right to an immediate ruling on its motion to vacate the Consent Decree (while reserving the right to refile it at any time) and to request that the City be held in contempt for failure to construct a detention facility by December 31, 1990. In return, the Stipulation and Agreement provides that the City will upgrade Philadelphia's prison system to meet correctional standards on a prescribed schedule and strengthen the current release program to reduce the inmate population in the interim. This relief is enforceable by fines and the court's contempt power.

The Stipulation and Agreement commits the City to provide 250 additional beds in the spring of 1991. This new facility will be operated by Greater Philadelphia Community Correction Center (GPCCC), presently operating a smaller community treatment center for state and federal probationers and parolees. The new facility will provide drug and alcohol abuse counseling, job referral and other support services sorely needed in this City. It will also accommodate sentenced prisoners on work release. This rehabilitation facility will provide an important and much needed resource for Philadelphia's criminal justice system.

The City is committed by the Stipulation and Agreement to project the inmate population for the next 10 years and then construct new facilities and close or renovate other facilities consistent with its projections. Funds are reserved to pay for consultants, architects, engineers and support services for the 1,000-bed detention facility and Criminal Justice Center. The City is also working with the state court administration to implement case management reforms recommended by various groups and commissions that have studied the criminal court system. The court is confident that this coordinated effort is the best way to address the overcrowding problem that gave rise to this litigation.

The pretrial release program will continue until the prison population is lowered to 3,750. However, if the state courts, with the assistance of the District Attorney, process cases more quickly and reduce the need for the City prisons to house substantial numbers of pretrial detainees, the release orders will become unnecessary sooner. The Philadelphia jails cannot hold all those awaiting trial or sentenced without jeopardizing the health and safety of the prisoners and their custodians. Releasing inmates accused of minor crimes and held on the lowest bail for the longest time is the least intrusive and effective interim method for dealing with overcrowding.

Inmates who will be released prior to trial are those accused of bailable offenses only; they are in prison because they cannot raise bail. Some of those released under this court's orders may commit additional offenses if not in custody but some accused persons released on bail also commit additional offenses while awaiting trial. This court's pretrial release mechanisms, effectively managed by the PMU and the People's Bail Fund, compare favorably with devices utilized elsewhere to control prison overcrowding. Concern for the public safety does not require disapproval of this Stipulation and Agreement.

Approving the Stipulation and Agreement is appropriate because its provisions are fair, adequate, and reasonable to the plaintiff class and in the public interest. For the reasons stated, the Stipulation and Agreement was approved and entered as an order of this court on March 11, 1991.