

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-15-1995

# Harris v City of Phila

Precedential or Non-Precedential:

Docket 93-1988

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Harris v City of Phila" (1995). *1995 Decisions.* Paper 48.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/48

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 93-1988


MARTIN HARRIS; JESSE KITHCART; WILLIAM DAVIS; RANDALL CUMMINGS;
EVELYN LINGHAM; ESTRUS FOWLER; TYRONE HILL; NATHANIEL CARTER

v.

THE CITY OF PHILADELPHIA;
JOAN REEVES, in her official capacity as Commissioner
of The Department of Human Services of the City of Philadelphia;
ALBERT F. CAMPBELL; ROSITA SAEZ-ACHILLA;
GENECE E. BRINKLEY, ESQ.; REV. PAUL M. WASHINGTON;
M. MARK MENDEL; HON STANLEY KUBACKI; MAMIE FAINES,
each in his or her official capacity as a member of the Board of
Trustees of the Philadelphia Prison System;
J. PATRICK GALLAGHER, in his official capacity as
Superintendent of the Philadelphia Prison System;
HARRY E. MOORE, in his official capacity
as Warden of Holmesburg Prison;
WILHELMINA SPEACH, in her official capacity
as Warden of the Detention Center;
PRESS GROOMS, in his official capacity as
Warden of the House of Corrections;
RAYMOND E. SHIPMAN, in his official capacity as
Managing Director of the City of Philadelphia; and
HON. EDWARD G. RENDELL, in his official
capacity as Mayor of the City of Philadelphia

Theodore Levine, Albert F. Campbell,
Rosita Saez-Achilla, Genece E. Brinkley, Esq.,
Rev. Paul M. Washington, M. Mark Mendel, Esq.,
Hon. Stanley Kubacki, Mamie Faines, J. Patrick Gallagher,
Harry E. Moore, Wilhelmina Speach, Press Grooms
Raymond E. Shipman, Hon. Edward G. Rendell
and the City of Philadelphia,

<u>Appellants</u>


On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. No. 82-cv-01847)


Argued September 14, 1994

Before:   SLOVITER, <u>Chief</u> <u>Judge</u>, MANSMANN and
              ALITO, <u>Circuit</u> <u>Judges</u>

(Filed February 15, l995 )

Mark A. Aronchick   (Argued)
Gary A. Rosen
Randy Karafin Hubert
Hangley, Connolly, Epstein,
Chicco, Foxman & Ewing
Philadelphia, PA  19102

James B. Jordan
Office of City Solicitor
Philadelphia, PA  19102

John W. Morris
Philadelphia, PA  19102-4813

          Attorneys for Appellants

Sarah B. Vandenbraak
Ron Eisenberg
Office of District Attorney
Philadelphia, PA  19102

          Attorney for Amicus-Appellant Lynne Abraham,
          District Attorney of Philadelphia County

Philip Lebowitz (Argued)
David Richman
Samuel J.B. Angell
Pepper, Hamilton & Scheetz
Philadelphia, PA  19103-2799

          Attorneys for Appellees

OPINION OF THE COURT


SLOVITER, Chief Judge.

This is one of a group of appeals by the City of
Philadelphia and its officials responsible for the operation of
the Philadelphia Prison System (referred to collectively as City
of Philadelphia) from orders of the district court holding it in
contempt and imposing fines or stipulated penalties because of
its failure to comply with various provisions of consent decrees
or related orders designed to ameliorate the overcrowded
conditions in the Philadelphia prison system.

In a separate opinion filed today, we affirm the order
imposing stipulated penalties of $584,000 for the City's lengthy
delay in submitting a Facilities Audit and Ten-Year Plan which it
had undertaken to prepare as part of the Prison Planning Process,
the long-term solution to overcrowding.  See Harris v. City of
Philadelphia, Nos. 93-1997, 93-2116, & 93-2117 (3d Cir. ____,
1995) (Harris V).  In the same opinion, we reverse the district
court's dismissal as a sanction of the City's Motion to Modify
the 1986 and 1991 Consent Decrees.  In a second opinion filed
today, we affirm the finding of contempt and imposition of a
$125,000 fine for the City's failure to meet certain occupancy
standards in the substance and alcohol abuse treatment facility,
a program the City undertook as one of the short-term solutions
to the prison population problem.  See Harris v. City of
Philadelphia, No. 94-1286 (3d Cir. ____, 1995) (Harris VI).

This appeal is from the finding of contempt and the imposition of a $106,000 penalty for the City's unilateral change in the procedure for designation of eligible pretrial detainees for release, another of the short-term solutions to prison overcrowding.

## I.

## BACKGROUND

The facts underlying these cases are set forth in detail in Harris V, typescript op. at 5-9. Briefly, the plaintiff class of inmates in the Philadelphia prison system and the City entered into a Consent Decree approved by the district court (the "1986 Consent Decree") to resolve the pending complaint alleging unconstitutional prison overcrowding.[1] The City agreed that while it was working on a long term solution to increase the number of prison facilities and beds, it would limit the number of inmates in the current facilities. Thus, the 1986 Consent Decree set a maximum allowable population ("MAP") by July 13, 1987 for the Philadelphia prison system of 3,750 inmates. The City agreed that if the inmate population exceeded the maximum it would seek the release of pretrial detainees held on the lowest bail or sentenced prisoners who had less than sixty days remaining to serve on their sentences. App. at 93. However, the 1986 Consent Decree expressly provided that the City was not "to seek the release of any person whose release would constitute an imminent threat to public safety or to the inmate's own health, safety or welfare," or "any person charged with, or convicted of, murder or forcible rape." App. at 93. If the MAP were still exceeded, the City agreed to limit new admissions to the prisons except for persons charged with or convicted of certain enumerated offenses, hence its denomination as a qualified admissions moratorium.

---

[1]. See Harris v. Reeves, 761 F. Supp. 382, 384-90 (E.D. Pa. 1991) (recounting the history of the litigation and efforts to alleviate overcrowding prior to the adoption of the 1991 Consent Decree).

Despite the City's efforts between 1986 and 1988 to reduce the prison population, the district court was advised that on June 3, 1988 there were 3,981 inmates in the Philadelphia prisons, 3,035 of whom were pretrial detainees.  As a result, on June 6, 1988 the district court ordered that the qualified admissions moratorium agreed to in the 1986 Consent Decree go into effect, with certain modifications.  See Supp. App. at 1431–34.  This barred admission until the Philadelphia prison population was within the MAP of any additional inmates except for persons charged with murder, attempted murder, forcible rape, attempted rape, involuntary deviate sexual intercourse, corrupting the morals of a minor, arson, robbery, kidnapping, aggravated assault, or a crime involving the use of a gun or knife, or felony drug charges involving specified amounts of narcotics.  Supp. App. at 1431–32.  The same order provided for release of some inmates on city-provided bail but the court stated that "[n]otwithstanding the agreement of the parties" it would not "reduce the current population by releasing on parole various categories of sentenced inmates."  Supp. App. at 1433.

Thereafter, at the request of the District Attorney, who had been granted objector status in the litigation, the court entered a series of orders excepting additional categories of defendants from the qualified admissions moratorium, including those accused of domestic violence and abuse, intimidation of witnesses or victims, those with two or more open bench warrants on non-summary offenses, and those with narcotics offenses involving lower quantities than those previously specified.  See

Harris v. Reeves, 761 F. Supp. 382, 387 (E.D. Pa. 1991).  Because these modifications to the moratorium increased the prison population, the court ordered certain "compensatory measures," including release of certain pretrial detainees.  See id..

Nonetheless, the prison population continued to grow. The court stated that it could "no longer, in good conscience, allow the prison population to remain at this dangerously high level," Supp. App. at 1296-1301, and by Order dated April 17, 1989 ("April 1989 Order") instituted new procedures for additional release of pretrial detainees.  Supp. App. at 1442. This order required the City's Prison Management Unit ("PMU"), a unit established by the City at court direction, to submit the names of the inmates proposed to be released to the Special Master and the District Attorney, who was to forward objections, if any, to a listing to the Special Master within 72 hours.  The April 1989 Order listed the categories of pretrial detainees eligible for release, and expressly provided that detainees charged with the enumerated offenses and domestic violence and abuse offenses were not to be released.  Supp. App. at 1440-43.

These steps stabilized the prison population between 4,600 and 4,700 for a few months but it soon surged again.  By August 1990 the Philadelphia prison population had risen to approximately 5000 inmates.  See Supp. App. at 1385.  By order entered September 7, 1990 following a hearing, the court ordered additional steps to reduce the prison population.[2]  In addition,

_____

[2].  The September 7, 1990 Order directed, inter alia, that certified youth offenders not be admitted to the prisons and that

on September 21, 1990 the court increased the quantity of narcotics charged against defendants excepted from the admissions moratorium, see Supp. App. at 1447-48, and issued another order detailing the provisions of the then-existing qualified admissions moratorium and release mechanism.  See App. at 100-08.

The population stood at 4,697 when the court approved a new Stipulation and Agreement negotiated by the parties, which it entered as an order on March 11, 1991 (the "1991 Consent Decree").  The raison d'être for the 1991 Consent Decree was the City's suspension of plans to build the 440-bed detention facility required under the 1986 Consent Decree.  The background leading to the 1991 Consent Decree is discussed in the district court's comprehensive opinion in Harris v. Reeves, 761 F. Supp. at 382-89, approving the parties' Stipulation and Agreement as reasonable.  The 1991 Consent Decree effected a number of measures, providing both long-term and short-term relief, including, as relevant here, continuance of the qualified admissions moratorium as set forth in the September 21, 1990 Order and modification of the release mechanism for pretrial detainees.  App. at 109-46.  It is this release mechanism that forms the basis for the dispute at issue here.

Paragraph 17(a) of the 1991 Consent Decree requires the City to "designate and submit" to the Special Master the names of inmates "who meet the criteria of Paragraph 4.E.(i)-(iii) of the

(..continued)
the City petition the state courts for early release of sentenced inmates who were within sixty days of their scheduled release. See Harris v. Reeves, 761 F. Supp. at 388.

September 21, 1990 Order which provides for the release of [certain categories of inmates]."[3] App. at 116. Those with enumerated offenses ("murder, attempted murder, forcible rape, attempted rape, involuntary deviate sexual intercourse, corrupting the morals of a minor, arson, kidnapping, aggravated assault, a crime of violence committed or attempted with a firearm, knife or explosive, and escape from custody," and certain domestic violence and abuse offenses) are not eligible for release. App. at 116 (¶ 17(a)(2)) (incorporating by reference ¶¶ 3A & B of September 21, 1990 Order, App. at 101-02.)

Paragraph 17(b) requires the City to submit to the Special Master no fewer than thirty-five (35) names per day, at least five (5) days per week, whenever the population is in excess of 3,750. App. at 117. The names of "those designated and submitted" by the PMU are to be provided to the District Attorney who "then shall have seventy-two (72) hours to communicate in writing . . . any alleged errors in application of the release criteria . . . or any objections to the release of any inmate based on considerations of public safety and supported by substantial evidence." App. at 117 (¶ 17(d)).

---

[3]. Paragraph 4.E.(1)-(3) of the September 21, 1990 Order provided that "Release categories shall be: (1) a person admitted to prison under prior orders of the court who is still detained but who would not be admitted under this order as now modified; (2) a prisoner held in default of the lowest amount of percentage bail as necessary to reduce the population in all institutions to the maximum allowable. If inmates considered for release under this paragraph are held in default of equal amounts of bail, preference shall be given to the inmate held the longest time[;] (3) a person charged with offenses enumerated in paragraphs 3A and B shall not be released pursuant to this paragraph." App. at 104.

The Special Master, who is required to "direct the release of all inmates who meet the criteria set forth in Paragraph 17.a," App. at 117, has very limited discretion; he can deny a petition "if, but only if," the District Attorney objects to a particular release on public safety grounds and designates another eligible pretrial detainee as a substitute. App. at 117 (¶ 17(e)). The City must comply with a release order within twenty-four hours after receiving it. App. at 118 (¶ 17(f)). The 1991 Consent Decree provides that the City may formulate and submit to the court other criteria and procedures for release of inmates as a possible alternative or concurrent mechanism. App. at 124 (¶ 30).

After the District Attorney unsuccessfully sought to block or delay effectuation of the 1991 Consent Decree by appeal, the district court ordered the new release mechanism implemented on November 25, 1991. In a memorandum dated December 6, 1991 to the PMU and the City Solicitor, the Special Master summarized the release procedures in place and noted that many of the inmates for whom he would approve release orders would not be immediately released. He explicitly referred, inter alia, to "the inmate [who] has other holds such as detainers, sentence deferred cases, or more serious charges" (hereafter referred to as "other holds") as an example of an inmate who would be designated for release but was not to be released. App. at 502. Such inmates would "remain in custody until the other holds are disposed" of, i.e. presumably until the more serious charge, which would be one of the enumerated charges, was dropped or otherwise disposed of or

until inmates on detainer or writs were transferred to the jurisdiction that issued them.

The 1991 Consent Decree contained a stipulated fine of $100.00 a day for each inmate "who should be designated for release in accordance with Paragraph 17 but is not so designated." App. at 119 (¶ 19(b)(2)). But "[d]efendants shall not incur fines . . . if they submit to the Special Master at least thirty-five (35) names per day meeting the other requirements of Paragraph 17, even if a greater number of inmates meets the criteria set forth in Paragraph 17.a." App. at 119 (¶ 19(c)).

Between the weeks ending November 25, 1991 and June 29, 1992 the City included in its daily list of thirty-five names pretrial detainees who had <u>any charge</u> that was eligible for release under what has come to be known as "<u>Harris v. Reeves</u> Sign-Own Bail" (generally shortened to "<u>HvR</u>-SOB"),[4] even though the detainee may have been subject to other holds or charges which would prevent an immediate release. App. at 479. The City's list of 175 names included inmates who were not eligible for release at that time as well as duplicative names because inmates were listed by charge so that a single inmate charged with more than one non-enumerated charge could be listed several times. Therefore, many fewer than the 175 listed were released.

---

[4]. Under the "Sign-Own Bail" program the district court had directed the City to post bail for certain inmates held in default of bail, principally those with low designated bail or held in prison for lengthy periods.

The effect of the procedure followed before July 1992 was to reduce bail on those charges that were not excepted from release, so that inmates with "other holds" could be released or transferred to another jurisdiction as soon as the basis for the "other hold" was cleared.

The events that gave rise to this particular contempt action began in early July 1992 when PMU revised its procedures in preparing the release lists following a meeting in the City Solicitor's office between Jeanne Bonney, the Director of PMU, and three members of the District Attorney's staff. There were also subsequent communications between Bonney and James Jordan, Chair of the Litigation Group of the City Solicitor's office, Ann Pasquariello, a Deputy City Solicitor, and a Special Assistant to the Mayor. App. at 482. Under the new procedure instituted, PMU only listed inmates who were eligible for immediate release. App. at 483. In addition, PMU stopped designating those detainees who the City deemed to be "a danger to themselves or to the community." App. at 483.

The new policy was formally defined in a memorandum to PMU dated August 5, 1992 by the City Solicitor's representative, Jordan, who directed that PMU list by defendants, not by charge, stating

> Please discontinue the prior practice of listing by the charged offense irrespective of whether the defendant in question is absolutely ineligible for release under the applicable criteria. Thus, you should not list any defendant with any outstanding charge or other matter which would disqualify that inmate from release under the provisions of the relevant Harris orders.

App. at 426.  Jordan specified the following four categories of detainees who had previously been listed and who were now not to be listed for release: (1) those with "other holds," (2) those with state or federal detainers who are being held on enumerated offenses, (3) those not eligible for release on the face of their charges, and (4) those who are a danger to themselves or to the community.  App. at 426–27, 485.

Jordan also notified the Special Master and counsel for plaintiffs of the policy changes on August 5, 1992, stating, "I have instituted these changes in policy based upon my careful reading of the appropriate consent decrees, orders, stipulations and opinions."  App. at 530.  Plaintiffs' counsel objected to these changed procedures, and the Special Master notified the court.  App. at 525–29.[5]

In response to the plaintiffs' objections, on September 24, 1992 the City Solicitor directed PMU to resume listing all "persons who are a danger to themselves or the community" but to submit those names separately under protest. PMU has since submitted "under protest, pending modification of the Decree," a "D" list with those inmates who need special mental health treatment and a "B" list with those inmates held on bail in excess of $75,000.  App. at 440–41, 492–93.

---

[5].  Starting the week of August 10, 1992, PMU prepared two lists of inmates––one was the release list and the other was the list of inmates who would have been designated before the change in procedure instructed in Jordan's August 5 memorandum.  App. at 486.

Director of PMU Bonney wrote a memorandum dated August 10, 1992 to Commissioner J. Patrick Gallagher and Deputy Commissioner Thomas Costello predicting that as a result of the City's change in procedure, there would be a substantial increase in pretrial inmate days, PMU's costs for continuous research and tracking would double, and that "at least 63 additional persons will remain in custody each week for an additional 30 days: an average 252 inmates per month, or 7,560 inmate days." App. at 552-53. In fact, during the weeks beginning August 10 through September 28, 1992, the number of inmates submitted by the City each week ranged from 45 to 101. App. at 493-94.

Plaintiffs filed a Motion on October 16, 1992 for Contempt Sanctions Against Defendants for Failure to Comply with the Court's March 11, 1991 Order. Supp. App. at 1501-14. The parties submitted the matter for disposition on a Stipulation of Facts and the deposition of the Director of PMU. The parties stipulated that from the week of July 6, 1992 through the week of November 16, 1992, the City would have listed 1,060 additional detainees had it followed its previous listing practices. At the hearing on contempt, the district court was visibly unimpressed with the City's argument that because it had not violated a clear and unambiguous provision of the consent decree, it should not be held in contempt for its unilateral implementation of the changes in procedures,[6] App. at 689-712, but the court nevertheless

---

[6]. The court stated "[i]t's not clear to me why the matter wasn't raised with the Court before the action was taken if you were in doubt as to what the obligations were." App. at 689.

entertained arguments from the parties and the District Attorney's office on the proper interpretation of the provisions for the release mechanism in the 1991 Consent Decree. See App. at 669-732.

In a Memorandum and Order dated June 14, 1993 the district court found the City in contempt of the 1991 Consent Decree and imposed a $106,000 fine, $55,000 which was to be paid forthwith. The fine was calculated on the basis of $100 for each inmate not designated on each release list from July 6, 1992 to November 16, 1992. The court ordered that the remainder of the fine might not be imposed if the City submitted an alternative plan to the release mechanism by July 30, 1993. The City paid the $55,000 fine but did not submit an alternative plan to the release mechanism and moved for reconsideration of the contempt finding. On September 14, 1993, the district court implicitly denied the motion for reconsideration and imposed the $51,000 balance of the fine. The City then filed a Motion Requesting that Contempt Fines Not Be Imposed, which the court denied by a Memorandum Opinion of February 16, 1994. The City appeals.

## II.

## DISCUSSION

### A.

#### Applicable Legal Principles

The City makes three interconnected arguments on appeal: first, that the district court failed to find that the City violated a clear and unambiguous court order for the implementation of the prisoner release mechanism; second, that

the 1991 Consent Decree does not in fact contain a clear and unambiguous mandate as to the procedures the City was to follow in implementing the prisoner release mechanism; and third, that the district court's legal interpretation of the 1991 Consent Decree was erroneous. Thus, the City seeks reversal of the district court's order of contempt, remission of all penalties, a declaration that the district court's interpretation of the consent decree is erroneous, and a holding that the City may continue to implement its revised release procedures.

The imposition of contempt is reviewed under an abuse of discretion standard and will only be disturbed if there is an error of law or a clearly erroneous finding of fact. United States v. Sarbello, 985 F.2d 716, 727 (3d Cir. 1993). We determine on a plenary basis whether the district court committed an error of law. See Sansom Comm. by Cook v. Lynn, 735 F.2d 1535, 1539 (3d Cir.), cert. denied, 469 U.S. 1017 (1984).[7]

The relevant legal principles are not difficult nor in dispute. Therefore, we need not pass through the litany of law relating to the prerequisites for a finding of contempt, which we have reviewed to the extent pertinent in our opinion today in Harris V, typescript op. at 35-36. Instead, we concentrate on the application of the principle that is at issue.

---

[7]. In our other Harris opinions today, we discuss and reject the City's argument that our review of a finding of contempt is plenary. See Harris V, typescript op. at 21 & n.11; Harris VI, typescript op. at 17 n.5.

Specificity in the terms of consent decrees is a predicate to a finding of contempt, see Inmates of the Allegheny County Jail v. Wecht, 754 F.2d 120, 129 (3d Cir. 1985), because "a person will not be held in contempt . . . unless the order has given him fair warning." See United States v. Christie Industries, Inc., 465 F.2d 1002, 1006 (3d Cir. 1972). This is reflected in the requirement of Fed. R. Civ. P. 65(d) that an injunction "shall be specific in terms," and shall describe "in reasonable detail" the act or acts sought to be restrained, a rule also applicable to consent decrees. See Angela R. v. Clinton, 999 F.2d 320, 325 (8th Cir. 1993).

The Supreme Court has held that persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct. See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967); see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 444 (1974); Schmidt v. Lessard, 414 U.S. 473, 476 (1974); Gunn v. University Comm. to End the War in Viet Nam, 399 U.S. 383, 388-89 (1970).

We have summarized the applicable law as follows: "In order to cite a person for contempt for violating a court order, two principles, each a corollary of the other, must, among other requirements, be established. The first of these is that it must be proved that the alleged contemnor had knowledge of the order which he is said to have violated. The corollary of this proposition is that the order which is said to have been violated must be specific and definite." Eavenson, Auchmuty & Greenwald

v. Holtzman, 775 F.2d 535, 544 (3d Cir. 1985) (quoting In re Rubin, 378 F.2d 104, 108 (3d Cir. 1967)).  We explained that these two principles are merged in the general statement that: "An order may be so vague or indefinite that, even though the alleged contemnor is chargeable with knowledge of such order, he cannot be punished for doing what he did in view of lack of certainty as to what it prohibited or directed."  Holtzman, 775 F.2d at 544 (quoting Rubin, 378 F.2d at 108).

We decide on a plenary basis whether the consent decree is ambiguous.  See Fox v. United States Dep't of Hous. & Urban Dev., 680 F.2d 315, 319-20 (3d Cir. 1982).  The resolution of ambiguities ought to favor the party charged with contempt.  See United States on behalf of IRS v. Norton, 717 F.2d 767, 774 (3d Cir. 1983); Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir. 1971).  In other words, a contempt citation should not be granted if "there is 'ground to doubt the wrongfulness' of" the defendant's conduct.  Quinter v. Volkswagen of America, 676 F.2d 969, 974 (3d Cir. 1982) (citing Fox v. Capital Co., 96 F.2d 684, 686 (3d Cir. 1938)).

It is because we must find not only that the contemnor had knowledge of the order but also that the order was "specific and definite" that a finding of contempt cannot be based merely on the City's alteration of its prior policy without seeking court approval or modification, which some language in the district court's opinion suggests was the basis for its contempt

finding.[8]  Absent any provision in the 1991 Consent Decree or an order of the court requiring the City to seek court approval before modifying its practice, its mere failure to do so before changing its procedures for implementing the release mechanism is not alone enough to sustain a contempt finding.

Courts must be careful not to impose obligations upon the parties beyond those they have voluntarily assumed.  See, e.g., Fox, 680 F.2d at 319; Johnson v. Robinson, 987 F.2d 1043, 1046 (4th Cir. 1993); Walker v. United States Dep't of Hous. & Urban Dev., 912 F.2d 819, 825-26 (5th Cir. 1990).  A consent decree "must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."  United States v. Armour & Co., 402 U.S. 673, 682 (1971).

There is no provision here requiring the City to seek prior approval from the court before modifying its policy, as appears in some consent decrees.  See, e.g., Gautreaux v. Landrieu, 523 F. Supp. 665, 675 (N.D. Ill. 1981) (consent decree provides that "HUD may change the terms of [contract with private agency required by consent decree] in the future . . . provided that none of the services provided for the benefit of eligible persons will be reduced or modified to their detriment without

_____

[8].  For example, the court stated, "[t]he court finds the City in contempt for its unilateral decision to modify the release mechanism with respect to detainees with 'other holds,'" Addenda to City's Brief at A-15, and "[t]he court finds the City in contempt for its unilateral decision to modify the release mechanism with respect to detainees deemed 'a danger to themselves or the community.'"  Addenda to City's Brief at A-23.

Court approval"), aff'd, 690 F.2d 616 (7th Cir. 1982); Oburn v. Shapp, 393 F. Supp. 561, 570 (E.D. Pa.) ("if there was . . . a change in the selection procedure [in related case] the consent decree in [that case] requires the defendants . . . to submit it to the court for approval"), aff'd, 521 F.2d 142 (3d Cir. 1975). We can understand the court's displeasure that the City, which was in continuous contact with the court[9], made "no effort to determine whether the court shared [its] understanding of the Stipulation and Agreement before the changes were unilaterally implemented," Addenda to City's Brief at A-12, but however discourteous and ultimately counterproductive the City's conduct was, it was not contemptuous in itself.  Moreover, the City did notify both the Special Master and the plaintiffs' counsel almost contemporaneously with its change in policy, so the plaintiffs' accusation that the City was trying to "play games" with the court may fall short.

The City argues that it did not violate any clear and unambiguous provision of the 1991 Consent Decree.  Paragraph 17 (b) of that Decree provides that the City "shall submit no fewer than thirty-five (35) names per day, at least five (5) days per week, whenever the population is in excess of 3,750."  App. at 117 (emphasis added).  The City acknowledges that once it changed its policy as to the inmates to be included on the list, it failed to list 35 inmates a day or 175 a week.  Plaintiffs do not

_____

[9].  In its opinion approving the 1991 Consent Decree, the district court noted that it had held 29 status conferences on the case up to that date.  Harris v. Reeves, 761 F. Supp. at 388.

contend that the City could be held in violation of the 1991 Consent Decree for failure to list 35 inmates a day if there were not that many inmates who fit the criteria for listing.[10]

The district court held the City liable for contempt for failure to list the following three categories of prisoners beginning in early July 1992: inmates with other holds; inmates held on enumerated offenses who have state or federal detainers; and inmates who, according to the City, "are a danger to themselves or the community."[11]  Thus we focus on whether it was clear and unambiguous that prisoners falling within each such category should have been listed.

B.

Inmates

With Other Holds

The district court included within this category inmates who are detained on enumerated charges and at least one non-enumerated charge.  Before early July 1992 these inmates were included on the proposed release lists submitted by PMU, but were

---

[10].  In approving the 1991 Consent Decree, the district court stated that "the Stipulation and Agreement requires the imposition of fines if the City fails to submit 175 petitions only if there are 175 eligible inmates."  Harris v. Reeves, 761 F. Supp. at 398 n.17 (emphasis added).

[11].  The City also changed its prior practice of listing inmates who on the face of their charges are not eligible for release. The district court found that the City was not in contempt in modifying the procedures in this category because the modifications were consistent with the 1991 Consent Decree. Therefore, this category is not under consideration in this appeal.

not included after Jordan's instructions.  The City contends that it is not required to list inmates who would not be eligible for immediate release.  Thus, it continues, it is not required to list inmates who are charged with a non-enumerated offense for which bail may be reduced if that inmate is also charged with an enumerated offense, which is generally a crime of violence, because the charge on the enumerated offense precludes immediate release.

The plaintiff counters, and the district court agreed, that the City must list inmates with both enumerated and non-enumerated offenses so that the inmates can be immediately released if and when the enumerated charges are dropped or otherwise disposed of.  It is not contested that failure to list such inmates under the release mechanism added three to four weeks to the release process if the enumerated charges were dismissed.

The district court commented that the Special Master contemplated that a detainee in this category would be listed for release on non-enumerated charges even if held on some other enumerated charge.  The issue is not, however, whether the Special Master or even the district court contemplated the City's listing of this category of inmates, but whether that requirement is unambiguously stated.[12]  We therefore turn to the relevant language.

---

[12].  Plaintiffs point to the following statement by the district court in Harris v. Reeves, 761 F. Supp. at 398, as evidence that the City must list inmates with both enumerated and non-numerated offenses.  "There will be other categories of inmates eligible

Under Paragraph 17(a) of the 1991 Consent Decree: Defendants shall designate and submit to the Special Master the names of inmates who meet the criteria of Paragraph 4.E.(i)-(iii) of the September 21, 1990 Order which provides for the release of:
(1) all persons admitted to the prisons under prior orders of the court who are still detained but who would not be admitted under the provisions of this order as now modified;
(2) prisoners held in default of the lowest amount of percentage bail as necessary to reduce the population in all institutions to the maximum allowable populations.  If inmates considered for release under this paragraph are held in default of equal amounts of bail, preference shall be given to the inmate held the longest time.  Persons charged with offenses enumerated in paragraphs 3A and B [of the September 21, 1990 Order] shall not be released pursuant to this paragraph.

Two paragraphs of the September 21, 1990 Order are referenced in paragraph 17(a).  The first reference is to paragraph 4.E.(i)-(iii) which describes the "release categories" in the exact same language as in paragraph 17(a) (except that the plural is used in paragraph 17(a)).  See note 3 supra.  The other reference is to paragraphs 3A and B of the September 21, 1990 Order which enumerated the pending charges that excepted inmates from release.  In essence, paragraph 17 merely provides that in order to reduce the population of the overcrowded prisons

(..continued)
for release. For example, the City will be able to submit the names of those inmates who were admitted to the prisons because they were charged with excepted offenses, are now eligible for release because the excepted charges have been dismissed but are still held on other non-excepted charges."  Id. (emphasis added). This is hardly an unqualified statement that the City must include such inmates if needed to meet its quota.  It was made, instead, in the context of responding to the District Attorney's concern about the pool of inmates "eligible for release," not about those who need be listed.

the City would release those prisoners who, under the qualified admissions moratorium, would not now be detained, and those prisoners who are not charged with one of the enumerated offenses in the order of longest-in, earliest-out.

The City's argument that it need not include on its list those prisoners who are charged with any enumerated offense is a plausible one from the language of the 1991 Consent Decree. It must "designate and submit" only the names of inmates who "meet the criteria" of the referenced paragraph of the September 21, 1990 Order. Inmates charged with "enumerated" offenses do not "meet the criteria" and therefore need not be listed.

Plaintiffs' argument "that the pool of eligible candidates was defined by the City's practice prior to July 1992," Appellees' Brief at 30, is not persuasive. While prior practice may be of assistance in interpreting a contract for purposes other than contempt, prior practice does not provide the clarity of language that precedent informs us is a predicate for any contempt ruling. Authority cited by plaintiffs in support of the principle that a consent decree must be construed in light of its purpose is to the same effect. In fact, in the case cited, In re Arthur Treacher's Franchise Litig., 689 F.2d 1150 (3d Cir. 1982), the court affirmed the contempt citation because the conduct violated "both the letter and spirit" of the underlying order. Id. at 1157 (emphasis added).

We cannot find an unambiguous provision in the 1991 Consent Decree or otherwise requiring the City to designate

inmates with other holds for purposes of the release mechanism.[13]
Therefore, we cannot uphold this portion of the contempt finding.

## C.

### Inmates with State or Federal Detainers

The district court included under this category both
those inmates held on enumerated offenses who also were subject
to state or federal detainers for, inter alia, parole or
probation violations and those inmates "on writ," i.e. those who
are here for court appearance.  To the extent that the district
court's finding of contempt was based on the fact that the City
had previously listed these inmates, our rejection of prior
practice to clarify an ambiguous requirement under the consent
decree in this context is equally applicable here.

The City, applying the same analysis as it used with
respect to inmates held on both enumerated and non-enumerated
charges, argues that "had the City designated and submitted the
names of these inmates for release, they would not have been
released, because they were being held not only on detainers, but
also on enumerated charges."  Appellants' Reply Brief at 8.
While we concluded above that the City's argument as applied to
inmates held on both enumerated and non-enumerated charges
persuaded us that there was a legitimate ambiguity that precluded

_____

[13]. We do not decide whether the language of the 1991 Consent
Decree was such that the district court, using permissible
interpretative aids or evidence, can construe it to support an
order requiring the City to list this category of inmate in the
future.  The only issue before us is whether the language is
sufficiently clear that the City must do so that its failure to
act in this manner supports a contempt finding.

a finding of contempt for failure to list inmates in that category, we are not similarly persuaded as to inmates held on detainer.  Of course, these inmates, like those held on enumerated and non-enumerated charges, were not eligible for "release" to the general population.  Unlike the other category of inmates, however, these inmates could have been eligible for "release" from the Philadelphia prisons by being transferred to some other jurisdiction.

In this connection, we cannot dismiss as irrelevant the district court's reliance on the fact that the First Deputy City Solicitor had notified the court by letter to the Special Master dated January 17, 1992 that the City "did not object to transferring inmates with state parole detainers" even though they had been charged and were being held in Philadelphia on one or more enumerated charges.  This is relevant not to show prior practice but to show that listing inmates with detainers from other jurisdictions could, in fact, have effected their removal from the Philadelphia prisons, with a consequent reduction in overcrowding.

Moreover, the 1991 Consent Decree, unlike the September 21, 1990 Order, does not provide any basis for construing the term "release" as a term of art.  Paragraph 4.A. of the September 21, 1990 Order required listing of a detainee "for release by court order on his or her own recognizance (HvR-SOB), on electronic monitoring (HvR-EM) or to a community corrections facility (HvR-CCF)."  App. at 103.  It follows that it would be reasonable to construe the listing requirement of the September

21, 1990 Order as applicable only to a detainee released on one of these three types of releases.

On the other hand, Paragraph 18 of the 1991 Consent Decree expressly provides that Paragraph 4.A. of the September 21, 1990 Order (which set forth these three types of release) is superseded.  See App. at 118 ("The procedures set forth in Paragraph 17 of this Stipulation and Agreement shall supersede Paragraphs 4.A.-C. of the September 21, 1990 Order.").  This removes any argument based on "release" as a term of art.

We have earlier accepted the City's argument that it should not be held in contempt for not listing prisoners with both enumerated and non-enumerated charges because, in its words, "the decree appears to contemplate that prisoners listed actually will be eligible to be set free, i.e., released, not just to have their bail reduced to 'HvR-SOB' on a single charge."  Appellants' Brief at 37.  That argument has no force when dealing with prisoners on detainers who are eligible to be released to other authorities.

In our prior discussion, we have recognized that ambiguities redound to the benefit of the contemnor.  This does not mean that a party can avoid following an injunction or court order "on merely technical grounds."  See Christie Indus., 465 F.2d at 1007.  In sustaining the finding of contempt in In Re Arthur Treacher's Franchise Litig. we looked to the "thrust of the . . . order."  689 F.2d at 1156.  We find it incontrovertible that the "thrust" of the 1991 Consent Decree was to move out of the Philadelphia prisons those who could be reasonably moved

elsewhere.  This entailed, <u>inter alia</u>, even the establishment of a program for alcohol and drug dependent inmates in another facility, the subject of our opinion in <u>Harris VI</u>.

There is no language that supports the City's failure to list inmates who might reasonably be transferred to other jurisdictions, or, as in the case of those "on writ," who might not be needed for immediate trial.[14]  Instead, by not listing these inmates the City deprived plaintiffs, the Special Master, and the court of the opportunity of arranging for their removal, even if temporary, from the Philadelphia prisons.[15]  Even Jordan's memorandum of August 5, 1992 recognized that such transfer could have been viable, for it stated:

> Please do not continue to list persons with State or Federal detainers and charged with enumerated offenses who are to be transferred to another jurisdiction.  Such persons are not required to be listed on the <u>Harris</u> release orders.  We will work with the courts and the District Attorney's Office to <u>improve the efficiency of available mechanisms for transfer of such persons</u>.

---

[14].  The parties have not clarified whether there is a pertinent distinction between inmates on federal and state detainers, to which our discussion applies, and those "on writ."  To the extent that those "on writ" also have pending against them an enumerated charge, and might have been eligible for transfer elsewhere, failure to list them is encompassed by this discussion.  If those inmates present a different situation the matter can be clarified, and presumably resolved between the parties and the court, within the framework of this opinion when it returns to the district court for modification of the amount of the sanction.

[15].  We need not decide whether each of these prisoners <u>would</u> have been transferred.  We recognize that there may have been some objection.  Instead, failure to list them deprived the court or its representative of any opportunity to consider such objection, if raised in a particular case.

App. at 426 (emphasis added).  We will therefore sustain the finding of contempt for failure to list inmates in this category.

D.

Inmates Who Are a "Danger to Themselves or to Others"

Jordan described the final category of inmates whom he directed PMU to stop listing as part of the release mechanism as "persons who are a danger to themselves or to others."  App. at 426.  The City cannot have been unaware that such a characterization would give the impression that the district court was directing the release of "dangerous" inmates without concern for the public welfare.  In Jordan's memorandum of September 24, 1992 Jordan directed PMU to list as "dangerous" those inmates whose bail is set at $75,000 or higher or who require mental health treatment.  Defining "dangerous" inmates in this manner does not arise out of anything in the 1991 Consent Decree, nor indeed out of any of the earlier stipulations, agreements, or court orders.

Further, the City stipulated that the 1991 Consent Decree contains no explicit exception to the release mechanism for inmates whom the City deemed to be "a danger to themselves or to the community."  App. at 483.

To justify its decision not to list for the release mechanism this category of inmates, the City refers us not to any provision of the 1991 Consent Decree but to Paragraph 4 of the 1986 Consent Decree which states the City agrees not to seek the release of any person charged with, or convicted of, murder or forcible rape or "whose release would constitute an imminent

threat to public safety or the inmate's own health, safety or welfare." App. at 93. In order to analyze the City's argument, it is necessary to recall that throughout the history of this litigation, beginning with the 1986 Consent Decree, there were offenses enumerated in both the release mechanism and the admissions moratorium to which those provisions did not apply. Presumably the parties enumerated the offenses they deemed identified inmates or defendants who presented the greatest danger to the public interest. Inasmuch as the admissions moratorium in the 1986 Consent Decree did not have any general exception under which the City could except those whom it believed were a threat to public safety comparable to the provision in the release mechanism, and it is as much a danger to public safety to refuse to admit a person charged with "or convicted" of a crime as it is to release that person if s/he is already in prison, it is reasonable to conclude that the parties equated the crimes excepted from the admissions moratorium as somewhat equivalent to those that constitute a threat to public safety. This equivalency runs through the various subsequent orders.

As detailed before, the 1986 Consent Decree was unsuccessful in effecting any significant short-term relief, and when the admissions moratorium went into effect in June 1988 it was the District Attorney (not the City) who, notwithstanding the denial of his intervenor status, petitioned the district court on a number of occasions and was successful in getting the court to order additional exceptions from the qualified admissions

moratorium for certain additional categories of charges. See Harris v. Reeves, 761 F. Supp. at 387.

None of the orders modifying or expanding the release mechanism and/or the qualified admissions moratorium addressed the "dangerous" inmate as such, i.e. outside the context of a specified crime. Notably, when the release mechanism was revised by the Order of April 17, 1989, it expressly provided for notice to the District Attorney who could notify the Special Master "of objections." Supp. App. at 1442. However, when the ineffectiveness of the 1986 Consent Decree became evident, and the City abandoned its plans for long-term relief, the parties, i.e. the City and the plaintiffs, renegotiated their agreement to the 1991 Consent Decree, that document did address the dangerous prisoner/public safety issue. In paragraph 17(e), the 1991 Consent Decree gave the District Attorney the right to object to release of a prisoner on public safety grounds. Notably, the 1991 Consent Decree did not incorporate a provision in the April 17, 1989 Order and the September 21, 1990 Order providing that PMU, the City's contractor, "shall . . . note" any information indicative that the listed inmate would "pose a risk of harm" if released. See App. at 103; Supp. App. at 1442. In holding the City in contempt for deciding, with no support in the language of the 1991 Consent Decree, that it need not list prisoners who are mentally ill and those for whom bail was set at $75,000, the district court held that paragraph 17(e) superseded the paragraph in the 1986 Consent Decree on which the City relied.

The City argues that it is a separate and distinct entity from the District Attorney, so that its policy of "not listing dangerous inmates follows common sense." Appellants' Brief at 44. We prefer not to comment on the "common sense" of the City or its representatives who have agreed to the procedures established in the orders and consent decrees at issue, and who unilaterally imposed the change in interpretation and procedures which precipitated the contempt findings resulting in this series of appeals.

We conclude that the district court's interpretation of Paragraph 17(e) of the 1991 Consent Decree as superseding Paragraph 4 of the 1986 Consent Decree is not erroneous, under even the most searching review. Although Paragraph 18 in the 1991 Consent Decree states that all unamended provisions of the September 21, 1990 Order remain in full force and effect, it explicitly modifies the release mechanism provisions in the September 21, 1990 Order. Paragraph 18 of the 1991 Consent Decree states that the release mechanism in Paragraph 17 supersedes Paragraphs 4.A-C of the September 21, 1990 Order but that otherwise the 1991 decree "shall not affect the operation of the September 21, 1990 Order or Paragraphs 1 and 2.a-c and h-i of the remedial provisions of the Consent Order of December 30, 1986." App. at 119 (emphasis added). Therefore, Paragraph 17 superseded the release mechanism of the September 21, 1990 Order and explicitly preserved only Paragraphs 1 and 2.a-c and h-i of

the 1986 Consent Decree.[16]  Paragraph 4 of the 1986 Consent

Decree from which the City derives its authority to not list

"dangerous" inmates has not been preserved by the 1991 Consent

Decree.

    The City argues that this interpretation is incorrect

because under the 1991 Consent Decree the District Attorney has

the power to prevent an inmate's release only if the District

Attorney can designate another eligible inmate to be released.

There are several responses.  The first, and most obvious, is

that this is the provision to which the City agreed.  We prefer

not to speculate as to the reason.  The second is that every

inmate at issue in this case is a pretrial detainee for whom bail

has been set and who, if s/he could provide that bail, would be

walking the streets.  The third is that if we agreed with the

City, Paragraph 17(e) of the 1991 Consent Decree specifying the

District Attorney as the one who could prevent release on "public

safety" grounds upon substitution of another inmate would be

surplusage, because the City could designate any inmate without

such substitution.

    In rejecting the City's defense to contempt on this

ground the district court agreed that inmates suffering from

mental illness are "poor candidates for release," but noted that

---

[16].  The City maintains that when the 1991 Consent Decree
superseded provisions of the earlier orders it specifically so
stated.  But the City fails to take the further step to evaluate
how the release mechanism evolved over time and how the authority
to prevent releases of "dangerous inmates" was shifted from the
City to the District Attorney.

they should be held, if at all, in the prison health services wing which is not subject to the 1991 Consent Decree and then would be properly excluded from release lists.  Addenda to City's Brief at A-23.  The City offers no response.  The district court also stated that the amount of bail is an inadequate determination of dangerousness.  We assume that the dispute on this category is in large part focused on certain defendants charged with drug crimes, which are not excepted from the release provision of the 1991 Consent Decree.

In light of the plain language of the 1991 Consent Decree read in the context of the history of the "danger" provision set forth above, we will affirm the district court's finding that the City violated an unambiguous provision of the 1991 Consent Decree by failing to list inmates who fell into the two categories it deemed "dangerous."[17]

## III.

## CONCLUSION

We will reverse the finding of contempt for failure to list inmates who were charged with enumerated as well as non-enumerated offenses, and we will affirm the finding of contempt for failure to list inmates with state or federal detainers and inmates who are a danger to themselves or others.  Because this will require a corresponding revision of the penalty which was

---

[17]. We find the argument that the court continues to monitor and enforce other provisions in paragraph 4 of the 1986 Consent Decree unavailing.  This practice may be unnecessary but it is not before us.

calculated based on each inmate per day who should have been listed but was not, we will remand for recalculation of the penalty.

We observe that the three opinions issued today are not independent of each other, although we have treated them separately for convenience. Indeed, they are interrelated parts of a complex ongoing litigation in which we believe the public interest would best have been served had the parties been able to maintain the same degree of cooperation that characterized their original entry of the Consent Decrees and Stipulations. Moreover, as we observed in the opinion in Harris V, many of the issues that divide the parties in this case with respect to the release mechanism might have been obviated had the district court considered the merits of the Motion to Modify. We trust that on remand steps will be taken to insure that the divisions that characterize the disputes that are the subject of this opinion will not recur.

_____

Harris v. The City of Philadelphia
No. 93-1988

ALITO, <u>Circuit Judge</u>, concurring and dissenting:


          I join parts I, IIA, and IIB of the opinion of the
court.  I cannot, however, agree with the court that the City of
Philadelphia was properly held in contempt for ceasing to list
(a) inmates with detainers who were ineligible for release
because they were held on "enumerated" offenses and (b) inmates
whom the City believed posed an imminent danger to the community
or to themselves.


          A.  <u>INMATES WITH DETAINERS</u>.  As the court acknowledges,
a party may not be held in contempt unless it violates a
"`specific and definite'" court order.  Maj. typescript at 17
(citations omitted).  <u>See also</u> <u>Eavenson, Auchmuty & Greenwald v.</u>
<u>Holtzman</u>, 775 F.2d 535, 544 (3d Cir. 1985); <u>In re Rubin</u>, 378 F.2d
104, 108 (3d Cir. 1967).  In ceasing to list inmates who were
charged in Philadelphia with "enumerated" (i.e., serious
offenses) and who also had detainers lodged against them, the
City did not, in my view, violate any specific and definite
prohibition.  I analyze this question in two steps.
          First, as the court appears to recognize (<u>see</u> Maj.
typescript at 23), <u>the City was not required to list inmates who</u>
<u>were ineligible for release under paragraph 17a of the 1991</u>
<u>Consent Decree</u>.  Paragraph 17 of the 1991 Consent Decree (the

provision that the district court found that the City had

violated) provides in pertinent part as follows:

> a.   <u>Defendants shall designate and submit to the
>      Special Master the names of inmates who meet the
>      criteria of Paragraph 4.E(i)-(iii) of the
>      September 22, 1990 Order which provides for the
>      release of:</u>
>
>   (1) all persons admitted to the prisons
>       under prior orders of the court who
>       are still detained but who would
>       not be admitted under the
>       provisions of this order as now
>       modified;
>
>   (2) prisoners held in default of the
>       lowest amount of percentage bail as
>       necessary to reduce the population
>       in all institutions to the maximum
>       allowable populations.  If inmates
>       considered for release under this
>       paragraph are held in default of
>       equal amounts of bail, preference
>       shall be given to the inmate held
>       the longest time.  Persons charged
>       with offenses enumerated in
>       paragraphs 3A and 3B[18] shall not be
>       released pursuant to this
>       paragraph. . . .

------

[18]. These paragraphs listed the following offenses:

> A.   Murder, attempted murder, forcible rape, attempted
>      rape, involuntary deviate sexual intercourse,
>      corrupting the morals of a minor, arson,
>      kidnapping, aggravated assault, a crime of
>      violence committed or attempted with a firearm,
>      knife, or explosives, and escape from custody.
>
> B.   Domestic Violence and Abuse Offenses. . . .

JA101.

> > e.  The Special Master shall direct the release of all inmates who meet the criteria set forth in Paragraph 17.a. . . .

JA116-17 (emphasis added).  Thus, paragraph 17a requires the defendants to submit to the Special Master the names of inmates who meet the specified criteria for release, and paragraph 17e requires the Special Master to "direct the release of all inmates" who meet those criteria.  JA117.  Accordingly, it seems clear that the defendants were not obligated to submit the names of inmates who were ineligible for release under paragraph 17a.

Second, it is at least arguable that all inmates charged with enumerated offenses (including those inmates who were charged with enumerated offenses and who also had detainers lodged against them) were ineligible for release under paragraph 17a.  Paragraph 17a(2) of the 1991 Consent Decree, which was quoted in full above, states in relevant part:

> Persons charged with offenses enumerated in paragraphs 3A and 3B shall not be released pursuant to this paragraph. . . .

JA116-17.  The term "this paragraph" must be interpreted as referring, at a minimum, to paragraph 17a (and not just paragraph 17a(2)).[19]  Accordingly, paragraph 17a(2) appears to prohibit any

---

[19].  This interpretation is dictated by the analogous provisions of the district court's order of September 21, 1990.  Paragraph 4E of that order provides in pertinent part as follows:

> E.  Release categories shall be:
>
> (1)  a person admitted to prison under prior orders of the court who is still detained but

person charged with an enumerated offense from being released pursuant to paragraph 17a. And since, as noted above, the City was required to list only those inmates who were eligible for release under paragraph 17a, it seems to follow that no inmates charged with "enumerated" offenses (including those inmates who also had detainers) were required to be listed.

In holding that the City was properly found in contempt, the majority relies in large part on what it views as

(..continued)
> who would not be admitted under this order as now modified;
>
> (2) a prisoner held in default of the lowest amount of percentage bail as necessary to reduce the population in all institutions to the maximum allowable. If inmates considered for release under this paragraph are held in default of equal amounts of bail, preference shall be given to the inmate held the longest time.
>
> (3) <u>a person charged with offenses enumerated in paragraphs 3A and B shall not be released pursuant to this paragraph</u>.

JA103-04 (emphasis added). Since paragraph 4E(3) does not provide for the release of any persons, the prohibition in that provision against release "pursuant to this paragraph" must at a minimum mean release pursuant to paragraph 4E (and specifically paragraph 4E(1) and (2)).

Paragraph 17a(1) and (2) of the 1991 Consent Decree restated paragraph 4E(1)-(3) of the September 21, 1990 order. Consequently, the statement in paragraph 17a(2) of the 1991 Consent Decree that "[p]ersons charged with offenses enumerated in paragraphs 3A and 3B shall not be released pursuant to this paragraph" should be given the same interpretation as the virtually identical language in paragraph 4E(3) of the September 21, 1990 order.

the "`thrust'" of the 1991 Consent Decree, i.e., "to move out of the Philadelphia prisons those who could be reasonably moved elsewhere."  Maj. Typescript at 27.  Even if we were required in this appeal to ascertain the best interpretation of the 1991 Consent Decree, I would, for the reasons explained above, have serious reservations concerning the majority's interpretation. But since, as the majority concedes, "ambiguities redound to the benefit of the contemnor," id., it seems quite clear that the City was not properly held in contempt for ceasing to list the inmates at issue here.[20]

---

[20]. The plaintiffs defend the district court's holding on a different ground.  They argue that the City was prevented from retaining custody of such inmates with detainers pursuant to paragraph 17a(1) of the 1991 Consent Decree.  This provision, as previously noted, requires the listing of:

> all persons admitted to the prisons under
> prior orders of the court who are still
> detained but who would not be admitted under
> the provisions of this order as now modified.

JA116.  The plaintiffs argue that such persons could not be "admitted" to the Philadelphia prison system as a result of paragraph 2h of the 1986 Consent Decree, which states that "[n]o federal or state prisoners other than inmates detained for immediate court appearances, shall be housed within the Philadelphia Prison System, except for those federal prisoners in the custody of the United States Marshal." JA92.  See Appellees' Br. at 35.

I am not persuaded that the district court's holding can be sustained on this ground, which neither the district court nor the majority of this panel has embraced.  For one thing, this argument does not address the language of paragraph 17a(2) of the 1991 Consent Decree, which, as explained above in text, appears to prohibit the release of the inmates in question. Consequently, even if the plaintiffs' interpretation of paragraph 17a(1) were accepted, their argument would at best create an

B.  UNDERLINE DANGEROUS INMATES.  I believe that the district court also erred in holding the City in contempt for ceasing to list inmates who would pose an imminent danger to the community or to themselves.

Paragraph 4 of the 1986 Consent Decree provides strong support for the City's argument that it was not required to list dangerous inmates.  This provision plainly states that the "City Defendants . . . agree not to seek the release of any person whose release would constitute an imminent threat to public safety or to the inmates' own health, safety or welfare."  JA93 (emphasis added).  Since, as previously discussed and as the majority itself appears to recognize (Maj. typescript at 23), the City was not obligated to list inmates who were not eligible for release, it follows that, as long as paragraph 4 of the 1986 Consent Decree remained in effect, the City was not required to list inmates that it regarded as dangerous.

The district court and the majority argue that paragraph 4 of the 1986 Consent Decree was superseded by paragraph 18 of the 1991 Consent Decree.  This latter provision states:

> The procedures set forth in Paragraph 17 of
> this Stipulation and Agreement shall
> supersede Paragraphs 4.A.-C. of the September
> 22, 1990 Order.  Otherwise, this Stipulation

(..continued)
ambiguity and, as the court notes, "[t]he resolution of
ambiguities ought to favor the party charged with contempt."
Maj. typescript at 18.

and Agreement shall not affect the operation of the September 22, 1990 Order or Paragraphs 1 and 2.a-c and h-l of the remedial provisions of the Consent Order of December 30, 1986, as amended, which shall remain in full force and effect except as they may be further amended.

JA118-119.

In my view, this provision is at least ambiguous as to whether Paragraph 4 of the 1986 Consent Order was superseded. While the court makes a rather elaborate argument in favor of supersedure (see Maj. typescript at 29-34), a very reasonable argument can be made in favor of a contrary interpretation. Because Paragraph 18 of the 1991 Consent Decree expressly provides for certain portions of prior orders (but not paragraph 4 of the 1986 Consent Decree) to be superseded, it can be argued with some force that no other supersedure should be inferred. As the majority notes, "[t]he resolution of ambiguities ought to favor the party charged with contempt." Maj. typescript at 18. Thus, because there are substantial ambiguities here, I think that the district court erred in holding the City in contempt for ceasing to list inmates whom the City regarded as dangerous.

I am particularly troubled by the district court's holding because of its potential impact on the public safety. One of the most basic and important responsibilities of a municipal government is to protect the safety of its people. It therefore seems difficult to imagine that any municipal government would voluntarily agree to participate in the

premature release of inmates whom it believes will pose an imminent threat to the community.  To be sure, if a municipal government unambiguously agrees to take such action, a court may have no alternative but to enforce the agreement.  But unless the agreement is truly unambiguous, I would think that a court cognizant of its responsibilities to the community would hesitate to require the municipality to follow a course of action that is antithetical to the municipality's most basic obligations and contrary to the public safety.

In conclusion, I do not think that the City violated any specific and definite provision of any order when it stopped listing any of the categories of inmates at issue in this appeal. Accordingly, I would reverse the district court order at issue in its entirety.